United States Court of Appeals,

Eleventh Circuit.

No. 97-5418.

The FLORIDA PARAPLEGIC, ASSOCIATION, INC. and The Association for Disabled Americans, Inc., Plaintiffs-Appellees,

v.

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA d/b/a Miccosukee Indian Bingo and Gaming, Defendant-Appellant.

Feb. 3, 1999.

Appeal from the United States District Court for the Southern District of Florida. (No. 96-2425-CV-WDF), Wilkie D. Ferguson, Jr., Judge.

Before TJOFLAT and EDMONDSON, Circuit Judges, and KRAVITCH, Senior Circuit Judge.

KRAVITCH, Senior Circuit Judge:

In this case of first impression, we must decide whether Title III of the Americans With Disabilities Act, 42 U.S.C. § 12181 et seq. ("Title III of the ADA" or "Title III") creates a private right of action against Indian tribes who allegedly have failed to comply with its requirements. Title III of the ADA prohibits discrimination against any individual "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). We hold that Congress has not abrogated tribal sovereign immunity with respect to this statute so as to allow a private suit against an Indian tribe.

## I. BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs, the Florida Paraplegic Association, Inc. and the Association for Disabled Americans, Inc. ("the Associations"), filed this lawsuit against the defendant, the Miccosukee Indian

Tribe ("the Miccosukee Tribe" or "the Tribe"), alleging that a restaurant and entertainment facility owned and operated by the Tribe fails to meet the ADA's requirement that places of public accommodation be accessible to the disabled. In their complaint, the Associations claim that, among other violations, the Tribe's facility does not comply with the ADA in the following respects: the handicapped parking is inadequate; the front door is too difficult to open; the wheelchair ramps have a slope that is too steep; and the bathrooms are not equipped properly for disabled individuals.[1] The Associations requested injunctive relief to compel the Tribe to conform its facility to the ADA's requirements for public accommodations. The Tribe moved to dismiss the complaint, asserting that the doctrine of sovereign immunity protects it from suit under this statute.

The district court decided that the ADA is a statute of general applicability and noted that "there is a presumption that a general statute will apply to all persons including Indians and their property interests."[2] Although it recognized three exceptions to this rule, the district court

---

[1]*See* Amended Complaint, R1-5, ¶ 8.

[2]Dist. Ct. Order, R1-11 at 1 (citing *Federal Power Comm'n v. Tuscarora Indian Nation,* 362 U.S. 99, 116, 80 S.Ct. 543, 553, 4 L.Ed.2d 584 (1960)). The district court determined that the Miccosukee Tribe conceded that the ADA is such a "generally applicable" statute. *See* Dist. Ct. Order, R1-11 at 1. Although it does not control our holding, *see infra* Part III.A, we note that the Tribe cannot be deemed to have unambiguously conceded this point. In its motion to dismiss, the Tribe made several arguments in support of its position that it is immune from private lawsuits under the ADA. The Tribe did recognize that "a general statute, which by its terms applies to all persons, includes Indians and their property interests," Tribe's Mot. to Dismiss, R1-7 at 4-5 (citing *Federal Power Com'n v. Tuscarora Indian Nation,* 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1060)), and argued that this case fell under one of the exceptions to that principle. According to one reasonable reading of the motion, however, this statement was an alternative argument and did not constitute an explicit admission that the Tribe was subject to the ADA unless an exception to the "general statute" rule applied. Thus, we cannot construe the Tribe's argument as a concession that the ADA is a generally applicable statute. *See Crowe v. Coleman,* 113 F.3d 1536, 1542 (11th Cir.1997) (holding, in context of appellate oral arguments, that "waivers and concessions ... need to be unambiguous before they are allowed to change the outcome of an appeal" (citing *Glick v. White Motor Co.,* 458 F.2d 1287, 1291 (3d Cir.1972) ("[T]o be binding, judicial admissions must be unequivocal."))).

nevertheless found that none of the exceptions was relevant to the present case.  The district court therefore concluded that the Miccosukee Tribe was not immune from suit under Title III of the ADA and denied the Tribe's motion to dismiss.  The Tribe appeals this ruling.

## II. STANDARD OF REVIEW

We review *de novo* the district court's ruling on the issue of a sovereign's immunity from suit.  *See Tinney v. Shores,* 77 F.3d 378, 383 (11th Cir.1996).

## III. ANALYSIS

### A. The Statute's Applicability to the Miccosukee Tribe

In denying the Miccosukee Tribe's motion to dismiss this case, the district court determined that the ADA applies to Indian tribes.  This conclusion was correct as far as it went.  As we discuss below, however, a statute can apply to an entity without authorizing private enforcement actions against that entity.

From the language of the legislation itself and from the legislative history, it is evident that the ADA is a general statute that Congress intended to have broad applicability.  Congress stated that the purpose of the ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "to invoke the sweep of congressional authority ... in order to address the major areas of discrimination faced day-to-day by people with disabilities."  42 U.S.C. § 12101(b)(1), (4).  The statute addresses discrimination in employment, public services, and public accommodations by private entities, and the terms "public accommodation" and "private entity" both are defined broadly.[3]  Senate and House reports

---

[3]Congress defined "private entity" as "any entity other than a public entity [as defined in Title II of the ADA, which bars discrimination by public entities]."  42 U.S.C. § 12181(6).  "Public accommodation" includes twelve expansive categories, each of which lists specific establishments and concludes with the language "or other [similar entities]."  *Id.,* § 12181(7).

accompanying Title III of the ADA emphasize Congress's intent that the statute apply universally:

> The twelve categories of entities included in the definition of the term "public accommodation" are exhaustive. However, within each of these categories, the legislation only lists a few examples and then, in most cases, adds the phrase "other similar" entities. The Committee intends that the "other similar" terminology should be *construed liberally consistent with the intent of the legislation that people with disabilities should have equal access to the array of establishments that are available to others who do not currently have disabilities.*[4]

Although neither we nor any other circuit previously has addressed whether the ADA is a general statute applicable to Indian tribes, several circuits have examined other federal statutes that set forth comprehensive schemes enforcing the protection of individual rights and have found those laws broad enough to manifest Congress's intent that they apply to Indian tribes.[5]

A general statute presumptively governs Indian tribes and will apply to them absent some superseding indication that Congress did not intend tribes to be subject to that legislation. *See Federal Power Comm'n v. Tuscarora Indian Nation,* 362 U.S. 99, 120, 80 S.Ct. 543, 556, 4 L.Ed.2d 584 (1960). The leading summary of the three circumstances that may defeat the "general statute" presumption is found in a Ninth Circuit case, *Donovan v. Coeur d'Alene Tribal Farm,* 751 F.2d 1113 (9th Cir.1985). As the district court recognized, a general statute applies to Indian tribes unless its application would (1) abrogate rights guaranteed under an Indian treaty, (2) interfere with purely intramural matters touching exclusive rights of self-government, or (3) contradict Congress's intent, *see id.* at 1116. The Associations and the Miccosukee Tribe agree that no treaty relevant to this case

---

[4]S.Rep. No. 101-116, at 59 (1989) (emphasis added); *see also* H.R.Rep. No. 101-485, pt. II, at 100 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 382-83 (same).

[5]*See, e.g., Reich v. Mashantucket Sand & Gravel,* 95 F.3d 174 (2d Cir.1996) (holding that Secretary of Labor could fine Indian tribe-owned and operated construction company for violations of the Occupational Safety & Health Act ("OSHA")); *Smart v. State Farm Ins. Co.,* 868 F.2d 929 (7th Cir.1989) (holding that the Employee Retirement Income Security Act ("ERISA") governs benefit plans of Indian tribe employers); *Donovan v. Coeur d'Alene Tribal Farm,* 751 F.2d 1113 (9th Cir.1985) (same as *Mashantucket Sand & Gravel* ).

exists and that Congress has not specifically expressed its intent that the ADA not apply to Indian

tribes. Thus, the presumption of applicability controls here unless the Act "touches "exclusive rights

of self-governance in purely intramural matters.' " *Coeur d'Alene,* 751 F.2d at 1116 (quoting *United*

*States v. Farris,* 624 F.2d 890, 893 (9th Cir.1980)).

We agree with the district court and the majority of our sister courts that have applied this

test that tribe-run business enterprises acting in interstate commerce do not fall under the

"self-governance" exception to the rule that general statutes apply to Indian tribes. In *Coeur d'Alene,*

the Ninth Circuit explained the limitations of this exception:

> [T]he tribal self-government exception is designed to except purely intramural matters such as conditions of tribal membership, inheritance rules, and domestic relations from the general rule that otherwise applicable federal statutes apply to Indian tribes.
>
> The operation of a farm that sells produce on the open market and in interstate commerce is not an aspect of tribal self-government. Because the Farm employs non-Indians as well as Indians, and because it is in virtually every respect a normal commercial farming enterprise, we believe that its operation free of federal health and safety regulations is neither profoundly intramural ... nor essential to self-government.

751 F.2d at 1116 (citations and internal punctuation omitted).[6] The Miccosukee Tribe's restaurant

and gaming facility is a commercial enterprise open to non-Indians from which the Tribe intends to

profit. The business does not relate to the governmental functions of the Tribe, nor does it operate

exclusively within the domain of the Tribe and its members. In fact, it is precisely the sort of facility

---

[6]*See also Mashantucket Sand & Gravel,* 95 F.3d at 179-82 (adopting *Coeur d'Alene* analysis as law of Second Circuit and holding that application of OSHA to tribal construction business does not fall within this exception); *Farris,* 624 F.2d at 893 (holding, in case involving gambling operation conducted on Indian trust land, that "the large-scale professional gambling involved here ... is neither profoundly intramural (the casinos' clientele was largely non-Indian) nor essential to self-government"); *but see Equal Employment Opportunity Comm'n v. Fond du Lac Heavy Equip. & Constr. Co.,* 986 F.2d 246, 249 (8th Cir.1993) (refusing to apply "general applicability" rule to Age Discrimination in Employment Act where employment relationship was between Indian tribe employer and Indian applicant, because "the tribe's specific right of self-government would be affected").

within "the array of establishments ... available to others who do not currently have disabilities" that Congress intended to make "equal[ly] access[ible]" to disabled individuals through enactment of Title III of the ADA.[7] We hold, therefore, that because the ADA is a generally applicable law and because no exception to the presumption that such statutes apply to Indian tribes controls this case, Title III of the ADA governs the Miccosukee Tribe in its operation of its gaming and restaurant facility.

The district court ended its consideration of the Tribe's motion to dismiss this lawsuit with its finding that Title III governs Indian tribes and that no exception prevents its application to the Miccosukee Tribe's commercial enterprise. The analysis does not stop here, however, for whether an Indian tribe is *subject* to a statute and whether the tribe may be *sued* for violating the statute are two entirely different questions. As the Supreme Court bluntly stated in *Kiowa Tribe v. Manufacturing Technologies, Inc.,* 523 U.S. 751, ----, 118 S.Ct. 1700, 1703, 140 L.Ed.2d 981 (1998), "[t]here is a difference between the right to demand compliance with state laws and the means available to enforce them." This principle, which simply spells out the distinction between a right and a remedy, applies with equal force to federal laws.

We turn now to the task of evaluating the question of whether, under the rules concerning tribal sovereign immunity, the Miccosukee Tribe is amenable to a private lawsuit alleging violations of Title III of the ADA.

### B. Tribal Sovereign Immunity

In a line of cases decided over a period of more than 150 years, the Supreme Court has recognized that Indian tribes "retain[ ] their original natural rights" which vested in them, as sovereign entities, long before the genesis of the United States. *Worcester v. Georgia,* 31 U.S. (6

---

[7]*See supra* note 4 and accompanying text.

Pet.) 515, 559, 8 L.Ed. 483 (1832).[8] Although Indian tribes are "domestic dependent nations" whose sovereignty is not absolute but may be limited by Congress, *see Oklahoma Tax Comm'n v. Potawatomi Indian Tribe,* 498 U.S. 505, 509, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991) (quoting *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831)), federal encroachment upon Indian tribes' natural rights is a serious undertaking, and we should not assume lightly that Congress intended to restrict Indian sovereignty through a piece of legislation.

This respect for the inherent autonomy Indian tribes enjoy has been particularly enduring where tribal immunity from suit is concerned. Thus, the Supreme Court has allowed the federal government to enforce with respect to Indians laws concerning, for example, federal income taxes and confiscation of land for federal projects, on the rationale, discussed *supra* Part III.A, that Congress meant the laws under which the federal agencies were acting to apply to Indians because they were "general statute[s] in terms applying to all persons" that did not explicitly exclude Indians.[9] *Tuscarora,* 362 U.S. at 116, 80 S.Ct. at 553. The Court unwaveringly has held, however, that "Indian Nations are exempt from suit without Congressional authorization," *United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940), and that "a [Congressional] waiver of [Indian tribal] sovereign immunity cannot be implied but must be unequivocally expressed," *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 1677,

---

[8]*See also, e.g., Holden v. Joy,* 84 U.S. (17 Wall.) 211, 242, 21 L.Ed. 523 (1872); *United States v. United States Fidelity & Guar. Co.,* 309 U.S. 506, 512-13, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940); *Puyallup Tribe, Inc. v. Dep't of Game,* 433 U.S. 165, 169-73, 97 S.Ct. 2616, 2619-21, 53 L.Ed.2d 667 (1977).

[9]*See Superintendent of Five Civilized Tribes v. Commissioner of Internal Revenue,* 295 U.S. 418, 55 S.Ct. 820, 79 L.Ed. 1517 (1935) (allowing Internal Revenue Service to collect federal income taxes from Indians); *Federal Power Com'n v. Tuscarora,* 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960) (permitting the Federal Power Commission to license the confiscation of Indian lands for energy projects).

56 L.Ed.2d 106 (1978) (internal quotations omitted).[10]  Just last term, the Court, although it questioned the historical legitimacy of the doctrine, reaffirmed that according to "settled law," an Indian tribe is not subject to suit unless the tribe waives its immunity or Congress expressly abrogates it.  *Kiowa Tribe,* 523 U.S. at ---- - ----, 118 S.Ct. at 1702-03.

With this firm rule in mind, we address the question of whether the Associations are permitted to sue the Miccosukee Tribe for allegedly violating Title III of the ADA.

## C. Interpreting Title III of the ADA

It is undisputed that the Miccosukee Tribe never waived sovereign immunity with respect to Title III in general or this lawsuit in particular.  Thus, the Tribe retains its common law immunity from private suit unless Congress "unequivocally expressed" its intent to abrogate Indian tribes' sovereign immunity under this statute.  *Martinez,* 436 U.S. at 58, 98 S.Ct. at 1677.  Although the Supreme Court has not elaborated on this waiver standard in the context of tribal sovereign immunity, the same standard applies in determining whether Congress has abolished federal and state governments' protection from suit.[11]  In this broader context of sovereign immunity, the Court

---

[10]*See also Potawatomi Tribe,* 498 U.S. at 509, 111 S.Ct. at 909 ("Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation.");  *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering,* 476 U.S. 877, 890-91, 106 S.Ct. 2305, 2313, 90 L.Ed.2d 881 (1986) ("The common law sovereign immunity possessed by the Tribe is a necessary corollary to Indian sovereignty and self-governance....  [I]n the absence of federal authorization, tribal immunity ... is privileged from diminution by the States.");  *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians,* 63 F.3d 1030, 1038 n. 30 (11th Cir.1995) ("Absent tribal waiver or congressional abrogation, an Indian tribe is shielded from suit by sovereign immunity." (citing *Martinez,* 436 U.S. at 58, 98 S.Ct. at 1677)).

[11]*See, e.g., Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 425-26, 88 L.Ed.2d 371 (1985) ("States may not be sued in federal court unless they consent to it in unequivocal terms or unless Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate the immunity.");  *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands,* 461 U.S. 273, 280, 103 S.Ct. 1811, 1816, 75 L.Ed.2d 840 (1983) ("States of the Union, like all other entities, are barred by federal sovereign immunity from suing the United States in the absence of an express

has held that Congress may abrogate a sovereign's immunity "only by making its intention unmistakably clear in the language of the statute"; legislative history and "inferences from general statutory language" are insufficient. *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985). We see no reason to adopt a different standard for evaluating Congressional intent with respect to the waiver of tribal sovereign immunity.[12] This determination is strengthened by the Supreme Court's repeated instruction that, because of the "unique trust relationship between the United States and the Indians," where Indian rights are at issue, ambiguities in federal laws must be resolved to the Indians' advantage. *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985).[13] We conclude, therefore, that Congress abrogates tribal immunity only where the definitive language of the statute itself states an intent either to abolish Indian tribes' common law immunity or to subject tribes to suit under the act.

An examination of Title III of the ADA reveals that it does not meet the strict requirements of this test. Despite its apparent broad applicability, *see supra* Part III.A, no specific reference to Indians or Indian tribes exists anywhere in Title III. Most significantly, the section of Title III

waiver of this immunity by Congress.").

[12]Although the Supreme Court has continued to emphasize, in cases such as *Potawatomi Tribe* and *Kiowa Tribe,* the rule that Congress must unequivocally express its intent to abrogate tribal sovereign immunity, the Court decided the landmark cases setting down this standard—*USF&G* and *Martinez*—in 1940 and 1978, respectively. Congress therefore had notice of the need to express its intent clearly when it enacted the ADA in 1990.

[13]*See also White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143-44, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980) ("Ambiguities in federal law have been construed generously in order to comport with ... traditional notions of sovereignty and with the federal policy of encouraging tribal independence."); *Reich v. Great Lakes Indian Fish & Wildlife Comm'n,* 4 F.3d 490, 493 (7th Cir.1993) ("[N]ot only treaties but (other) federal statutes as well are to be construed so far as is reasonable to do in favor of Indians.").

pertaining to enforcement of its prohibition of discrimination in places of public accommodation simply states that the same remedies are available to aggrieved persons under this statute as are open to victims of discrimination in public accommodations under Title II of the Civil Rights Act of 1964: namely, "a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved...." 42 U.S.C. § 2000a-3(a), *cited in* 42 U.S.C. § 12188. Neither the enforcement provision of Title III of the ADA nor the parallel section of the Civil Rights Act specifically authorizes suits against Indian tribes who allegedly have violated the Acts' substantive requirements. In short, Congress declined to abrogate Indian tribes' sovereign immunity from suit either by direct statement in Title III itself or by reference to other statutes having that effect. No support exists in the statute for a finding that Congress has waived tribal sovereign immunity under Title III of the ADA.

Even perfunctory reference to other statutes in which Congress directly *has* addressed the amenability of tribes to suit strengthens our conviction that Title III of the ADA is not one of those acts through which Congress intended to infringe upon Indian tribes' sovereign rights. For example, the Hazardous Materials Transportation Uniform Safety Act of 1990 ("HMTUSA"), 49 U.S.C.App. § 1801 et seq. (repealed 1994), while in effect, provided that "[a]ny person, including a State or political subdivision thereof or Indian tribe, directly affected by any requirement of a State or political subdivision or Indian tribe, may apply to the Secretary [of Energy] ... for [an administrative] determination of whether that requirement is preempted by [federal law]." *Id.,* § 1811(c)(1). The statute also stated that "[n]othing in [this section] prohibits a State or political subdivision thereof or Indian tribe, or any other person directly affected by any requirement of a State or political subdivision thereof or Indian tribe, from seeking a determination of preemption in any court of competent jurisdiction in lieu of applying to the Secretary under paragraph (1)." *Id.,* § 1811(c)(2).

At least two of our sister circuits found that this language manifested Congress's intent to abrogate sovereign immunity from suits seeking a declaration of federal preemption under the HMTUSA of an Indian tribe's attempt to regulate the transportation of hazardous materials. *See Public Service Co. v. Shoshone-Bannock Tribes,* 30 F.3d 1203 (9th Cir.1994); *Northern States Power Co. v. Prairie Island Mdewakanton Sioux Indian Community,* 991 F.2d 458 (8th Cir.1993).

Similarly, the Resource Conservation and Recovery Act of 1976 ("RCRA"), aimed at remedying pollution caused by improper disposal of hazardous and solid waste, authorizes citizens to bring suits to force compliance with the statute "against any person ... who is alleged to be in violation [of the statute's substantive provisions]." 42 U.S.C. § 6972(a)(1)(A). The definition of "person" includes a "municipality," which in turn encompasses "an Indian tribe" by express statutory delineation. *Id.,* § 6903(13), (15). According to at least one court, these terms, in conjunction with the history of the RCRA, "clearly indicate[ ] congressional intent to abrogate the Tribe's sovereign immunity with respect to violations of the RCRA." *Blue Legs v. United States Bureau of Indian Affairs,* 867 F.2d 1094, 1097 (8th Cir.1989).[14]

These two statutes—the (now repealed) HMTUSA and the RCRA—are not before us, and we do not purport to decide for this circuit whether the language quoted from each of them abrogates Indian tribes' sovereign immunity with respect to the substantive provisions of those acts. We note, however, that the wording of these laws at least implies that Congress comprehends the need to address Indian tribes specifically and individually when it describes the means of enforcing statutorily created rights through judicial action. When we compare Title III of the ADA to the

---

[14]*See also State of Washington, Dept. of Ecology v. United States Environmental Protection Agency,* 752 F.2d 1465, 1469 (9th Cir.1985) (addressing separate but related issue and noting definitions described above which appear to evidence Congressional intent to abrogate tribal sovereign immunity under the RCRA).

HMTUSA and the RCRA, the absence of *any* reference to Indian tribes in the former statute stands out as a stark omission of any attempt by Congress to declare tribes subject to private suit for violating the ADA's public accommodation requirements.[15]

One other provision of the ADA provides further support for our conclusion that Congress did not intend to abrogate sovereign immunity with respect to Indian tribes. Section 12202 states:

> A State shall not be immune under the eleventh amendment ... from an action in Federal or State court of competent jurisdiction for a violation of [any portion of the ADA]. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

42 U.S.C. § 12202. This provision demonstrates Congress's full understanding of the need to express unambiguously its intent to abrogate sovereign immunity where it wishes its legislation to have that effect. That comprehension is underscored in the legislative history to section 12202, which states:

> This section removes immunity of states granted by the Eleventh Amendment of the Constitution. The Committee intends for states to be covered by the ADA, where applicable, and to be subject to suit in federal or state courts. The remedies available against state defendants are the same as those available against other defendants.
>
> This section was included to meet the requirements of *Atascadero State Hospital v. Scanlon* [, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985) (holding that to abrogate state sovereign immunity Congress must make such intent "unmistakably clear in the language of the statute") ].[16]

Thus, Congress has demonstrated in this very statute its ability to craft laws satisfying the Supreme Court's mandate that courts may find that Congress has abrogated sovereigns' immunity from

---

[15]The cases discussed in footnote 5, *supra,* holding that OSHA and ERISA apply to Indian tribes despite the absence in those statutes of any direct reference to tribes, do not contradict our conclusion that private suits against Indian tribes may be authorized only by explicit statutory language. Those cases did not involve private suits against Indian tribes.

[16]H.R.Rep. No. 101-485, pt. III, at 72 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 495.

lawsuits only where it has expressed unequivocally its intent to do so. That it chose not to similarly include an abolition of the immunity of Indian tribes is a telling indication that Congress did not intend to subject tribes to suit under the ADA.[17]

Given the complete absence in the ADA of any reference to the amenity of Indian tribes to suit, exhaustive analysis of the legislative history would be superfluous. We have studied the legislative history, however, and furthermore observe that a lengthy discussion of its relevance to the issue before us would be impossible. Quite simply, there is nothing to discuss: the committee reports and transcripts of the floor debates do not contain any information regarding the effect of the ADA on Indian tribes that is not found in the statute itself.[18] This dearth of material on the matter supports our conclusion that Congress did not contemplate that Indian tribes would be subject to private lawsuits for violating Title III of the ADA.

## IV. EFFECT OF TRIBAL IMMUNITY ON POTENTIAL REMEDIES

---

[17]The Associations argue that evidence of Congress's intent to subject Indian tribes to the requirements of Title III is found in Title I of the ADA, which prohibits discrimination against disabled individuals in employment. Title I specifically excludes Indian tribes from the definition of "employer," thus exempting them from coverage of that portion of the ADA. *See* 42 U.S.C. § 12111(5)(B)(i). According to the Associations, Congress's decision to exclude tribes from one title of the statute demonstrates that it intended the remaining titles to cover tribes. This argument supports the conclusion we reached in Part III.A that Title III *applies* to Indian tribes but sheds no light upon the critical question of whether tribes also may be sued by private citizens for violating the law.

[18]The only reference we found to Indian tribes in the entire legislative history of the ADA appears in the committee reports to Title I: "Consistent with title VII of the Civil Rights Act of 1964, the term "employer' under this legislation does not include (i) the United States, a corporation wholly owned by the government of the United States, or an Indian tribe...." S.Rep. No. 101-116, at 24-25 (1989); *see also* H.R.Rep. No. 101-485, pt. II, at 54 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 336. Similarly, Congress modeled Title III of the ADA, which does not refer to Indian tribes at all, after Title II of the 1964 Civil Rights Act. *See* 42 U.S.C. § 2000a et seq.; S.Rep. No. 101-116, at 76 (1989). The legislative histories of both the ADA and the Civil Rights Act are void of any explanation for this distinction or any further information regarding the scope of the statutes' coverage with respect to Indian tribes.

The juxtaposition of Title III's applicability to the Miccosukee Tribe with the tribe's sovereign immunity from suit by disabled individuals to enforce their right to accommodations may be troubling, but it is not unprecedented. In *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), the leading case on the standard for Congressional abrogation of tribal sovereign immunity, the Supreme Court addressed the Indian Civil Rights Act of 1968 ("ICRA"), which provides that "[n]o Indian tribe in exercising powers of self-government shall ... deny to any person within its jurisdiction the equal protection of its laws...." 25 U.S.C. § 1302(8). A female tribe member alleged that a Santa Clara Pueblo tribal law that extended tribe membership to the children of male members and female non-members, but denied membership to the children of female members and male non-members, violated this provision of the ICRA and sued the Tribe for declaratory and injunctive relief. *Martinez,* 436 U.S. at 51-53, 98 S.Ct. at 1673-74. The Tribe "concede[d] that [the ICRA] modifie[d] the substantive law applicable to [it]" but contended that it could not be sued in federal court for ICRA violations because the only relief for which Congress provided in the ICRA was the writ of habeas corpus. 436 U.S. at 57-58, 98 S.Ct. at 1676-77. The Supreme Court agreed, holding:

> Nothing on the face of ... the ICRA purports to subject tribes to the jurisdiction of the federal courts in civil actions for injunctive or declaratory relief. Moreover, since the respondent in a habeas corpus action is the individual custodian of the prisoner, the [ICRA habeas corpus provisions] can hardly be read as a general waiver of the tribe's sovereign immunity. In the absence here of any unequivocal expression of contrary legislative intent, we conclude that suits against the tribe under the ICRA are barred by its sovereign immunity from suit.

*Id.* at 59, 98 S.Ct. at 1677 (citation omitted). Thus, the Supreme Court recognized that Congress could enact a statute with substantive limitations on Indian tribes without providing any means for most individuals protected by the law to enforce their rights in federal court.[19]

---

[19]The Supreme Court observed that "[t]ribal forums are available to vindicate rights created by the ICRA, and [the ICRA] has the substantial and intended effect of changing the law which

Although Congress's failure to abrogate Indian tribes' sovereign immunity under Title III of the ADA limits the means available to enforce its public accommodation requirements in tribe-owned and -operated enterprises, this omission is not as crippling as the scheme Congress devised for enforcement of the ICRA. In the latter statute, *no* federal remedy exists for tribal violations of Indians' rights except the writ of habeas corpus. Under Title III of the ADA, however, Congress has created an alternative method of enforcement: the United States Attorney General may bring a civil action to compel Indian tribes' compliance with the statute. Title III specifically authorizes the Attorney General to bring suit against "any person or group of persons ... engaged in a pattern or practice of discrimination."[20] As we held in Part III.A, *supra,* Title III applies to Indian tribes; moreover, "[t]ribal sovereign immunity does not bar suits by the United States." *Reich v. Mashantucket Sand & Gravel,* 95 F.3d 174, 182 (2d Cir.1996) (citing *Quileute Indian Tribe v. Babbitt,* 18 F.3d 1456, 1459-60 (9th Cir.1994) (observing that "tribal sovereignty does not extend

---

these forums are obliged to apply. Tribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians." 436 U.S. at 65, 98 S.Ct. at 1680-81 (footnotes omitted). Thus, although grievants could pursue some method of recourse for alleged ICRA violations, there existed no *federal* remedy for many breaches of the federally created rights granted in the ICRA.

[20]42 U.S.C. § 12188(b)(1)(B) provides:

> If the Attorney General has reasonable cause to believe that—
>
> > (i) any person or group of persons is engaged in a pattern or practice of discrimination under this subchapter; or
> >
> > (ii) any person or group of persons has been discriminated against under this subchapter and such discrimination raises an issue of general public importance,
>
> the Attorney General may commence a civil action in any appropriate United States district court.

to prevent the federal government from exercising its superior sovereign powers")).[21] The Attorney General therefore may pursue an action against Indian tribes failing to comply with Title III just as it may enforce the act against any other entity that violates the statute.

## V. CONCLUSION

The federal government is responsible for harmonizing the competing interests of allowing Indian tribes, sovereign yet subordinate dependent nations, to maintain their independence but, at the same time, requiring tribes to comply with the same rules that bind all other political subdivisions of the United States. As Indian tribes and their members become more integrated into the mainstream cultural and economic activities of American society, maintaining this balance becomes increasingly difficult. Indian sovereignty has deep historical roots, however, and the presumption that tribes should not be subjected to lawsuits in state or federal court remains as strong today as ever.

The Supreme Court repeatedly has emphasized that Congress may abrogate this sovereign immunity only by unequivocal expression in the language of the relevant statute. Furthermore, Congress has proven its understanding of this standard both in the ADA, with respect to state sovereign immunity, and in other laws with respect to Indian tribes' sovereign immunity; yet in Title III of the ADA, it elected not to declare that private grievants may sue Indian tribes for alleged violations of the statute. Although the omission of this remedy may seem inconsistent with the rights granted by Title III, and even patently unfair, "[i]mmunity doctrines inevitably carry within them the seeds of occasional inequities.... Nonetheless, the doctrine of tribal immunity reflects a

---

[21]*See also United States v. Red Lake Band of Chippewa Indians,* 827 F.2d 380, 382 (8th Cir.1987) ("[I]t is an inherent implication of the superior power exercised by the United States over the Indian tribes that a tribe may not interpose its sovereign immunity against the United States.").

societal decision that tribal autonomy predominates over other interests." *Wichita & Affiliated Tribes of Oklahoma v. Hodel,* 788 F.2d 765, 781 (D.C.Cir.1986).

Because we find that Congress did not unequivocally express an intent to abrogate tribal sovereign immunity from private suit under Title III of the ADA, we hold that the Associations may not pursue this action against the Miccosukee Tribe. We REVERSE the order of the district court and REMAND the case with instructions to the district court to dismiss the complaint.