Jerry SANDERLIN, Plaintiff-Appellant,

v.

SEMINOLE TRIBE OF FLORIDA, Defendant-Appellee.

No. 00-10312.

United States Court of Appeals,

Eleventh Circuit.

March 8, 2001.

Appeal from the United States District Court for the Southern District of Florida. (No. 99-06641-CV-WPD), William P. Dimitrouleas, Judge.

Before EDMONDSON and MARCUS, Circuit Judges, and RESTANI[*], Judge.

MARCUS, Circuit Judge:

Plaintiff Jerry Sanderlin appeals the district court's order granting Defendant Seminole Tribe of Florida ("Tribe")'s motion to dismiss for lack of jurisdiction. Sanderlin also appeals the district court's denial of his motion for reconsideration as well as that court's denial of his motion to compel certain jurisdiction-related discovery. In his complaint Sanderlin alleges that the Tribe discriminated against him on the basis of disability in violation of the federal Rehabilitation Act. The district court dismissed the case because it found that the Tribe was entitled to the sovereign immunity accorded Native American tribes. Sanderlin does not dispute that the Tribe generally would be entitled to immunity, but asserts that in this context Congress has abrogated that immunity, and additionally that the Tribe waived whatever immunity it may have had by accepting federal funds.

Because the Tribe has not waived its sovereign immunity, and Congress did not expressly abrogate that immunity through the Rehabilitation Act, the district court properly dismissed Sanderlin's lawsuit. Nor did the district court commit reversible error by denying Sanderlin's motion for reconsideration and motion to compel. Accordingly, we affirm.

I.

The relevant background is straightforward. Sanderlin was hired by the Tribe, a federally-recognized Native American tribe, in January 1993 to be a law enforcement officer with the Seminole Department of Law Enforcement ("SDLE"). In July 1996, Sanderlin suffered a seizure, and subsequently was diagnosed with

---

[*]Honorable Jane A. Restani, Judge, U.S. Court of International Trade, sitting by designation.

epilepsy. On July 17, 1996, Sanderlin returned to light duty with a restriction against the use of a firearm or the operation of a police cruiser. Sanderlin was accommodated in that way through January 6, 1997, when he returned to work on road patrol. On March 20, 1998, Sanderlin suffered another seizure. Three days later he returned to full duty with a driving restriction. On June 21, 1998, however, Sanderlin was terminated.

On May 26, 1999, Sanderlin filed this action in the United States District Court for the Southern District of Florida alleging that the Tribe had discriminated against him on the basis of his disability (epilepsy), in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* ("the Act"). In his complaint, Sanderlin alleged that he was able to perform the essential functions of a law enforcement officer either with or without reasonable accommodation, and that "[t]he Defendant refused to provide a reasonable accommodation to the Plaintiff for his continued employment." Sanderlin sought reinstatement, with any necessary reasonable accommodation, to his previous position, or alternatively front pay. Sanderlin also sought compensatory and punitive damages and back pay.

On July 30, 1999, the Tribe moved to dismiss for lack of subject matter jurisdiction. The Tribe argued that it was immune from suit under the Act because it had not waived its tribal sovereign immunity nor had Congress expressly and unmistakably abrogated that immunity. While the motion to dismiss was pending, Sanderlin filed a motion to compel discovery, seeking to compel the Tribe to produce documents reflecting its receipt of funds from the United States Government ("Government"). These documents, according to Sanderlin, were relevant to establishing jurisdiction.

On December 21, 1999, the district court granted the Tribe's motion to dismiss, holding that it did not have jurisdiction over Sanderlin's claim because the Tribe had not waived its right to tribal immunity and Congress had not abrogated tribal immunity under the Act. In the same order, the court also denied all pending motions, including Sanderlin's motion to compel, as moot. On December 30, 1999, Sanderlin, citing new evidence, moved the district court to reconsider the dismissal order. The district court denied that motion on January 5, 2000. This appeal followed.

## II.

We review de novo the district court's dismissal of a complaint for sovereign immunity. *See State of Florida v. Seminole Tribe,* 181 F.3d 1237, 1240-41 (11th Cir.1999); *Florida Paraplegic Ass'n, Inc. v. Miccosukee Tribe of Indians,* 166 F.3d 1126, 1128 (11th Cir.1999). The denial of a motion for reconsideration or a motion to compel discovery is reviewed only for abuse of discretion. *See Lockard v.*

*Equifax, Inc.,* 163 F.3d 1259, 1267 (11th Cir.1998) ("This court reviews the denial of a Rule 59 motion [for reconsideration] for an abuse of discretion."); *Burger King Corp. v. Weaver,* 169 F.3d 1310, 1320 (11th Cir.1999) (reviewing denial of a motion to compel for abuse of discretion).

### III.

We address first the question of sovereign immunity and subject matter jurisdiction. It is well-settled that "[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.,* 523 U.S. 751, 754, 118 S.Ct. 1700, 1702, 140 L.Ed.2d 981 (1998); *see also Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe,* 498 U.S. 505, 509, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991) ("Suits against Indian tribes are [ ] barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation."); *Seminole Tribe,* 181 F.3d at 1241 ("A suit against an Indian tribe is ... barred unless the tribe clearly waived its immunity or Congress expressly abrogated that immunity by authorizing the suit."); *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians,* 63 F.3d 1030, 1038 n. 30 (11th Cir.1995) (same). Although Congress "has occasionally authorized limited classes of suits against Indian tribes" and "has always been at liberty to dispense with [ ] tribal immunity or to limit it," it nevertheless has "consistently reiterated its approval of the immunity doctrine." *Oklahoma Tax Comm'n,* 498 U.S. at 510, 111 S.Ct. at 910. Moreover, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985) (same); *Oneida County v. Oneida Indian Nation,* 470 U.S. 226, 247, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985); *see also Florida Paraplegic Ass'n,* 166 F.3d at 1130 ("[W]e should not assume lightly that Congress intended to restrict Indian sovereignty through a piece of legislation.").

Sanderlin contends that both exceptions to the rule of tribal sovereign immunity are present in this case. He asserts that the Tribe waived its immunity by accepting federal funds contingent on compliance with the Rehabilitation Act. He also asserts that Congress abrogated tribal immunity when it enacted relevant portions of the Act. We consider these arguments in turn.

### A.

Sanderlin argues that, by accepting federal funds, the Tribe voluntarily waived its right to immunity from lawsuits under the Rehabilitation Act. Sanderlin does not suggest that the Tribe explicitly waived its right to immunity, but rather maintains that the Tribe did so implicitly when Tribal Chief and Chairman James

Billie accepted federal funds on the Tribe's behalf. This implied waiver argument has two parts. First, Sanderlin contends that Chief Billie acted with actual or apparent authority to waive the Tribe's sovereign immunity when he entered into contracts with the Government for the receipt by the Tribe of federal funds. Second, Sanderlin contends that by entering into these contracts—which required the Tribe to refrain from discrimination on the basis of disability—Chief Billie specifically waived the Tribe's sovereign immunity from suits under the Rehabilitation Act.

We are unpersuaded. "The Supreme Court has made it plain that waivers of tribal sovereign immunity cannot be implied on the basis of a tribe's actions, but must be unequivocally expressed." *Seminole Tribe,* 181 F.3d at 1243. Although the Court has expressed some skepticism regarding the current expansive state of tribal sovereign immunity, it has declined to rewrite its existing case law and has instead deferred to Congress to alter or narrow the bounds of that immunity. *See Kiowa,* 523 U.S. at 758, 118 S.Ct. at 1704 (noting that "in our interdependent and mobile society, ... tribal immunity extends beyond what is needed to safeguard tribal self-governance," but declining to revisit the broad grant of immunity afforded by prior decisions). Sanderlin has not presented any evidence sufficient to show that Seminole Tribe expressly and unmistakably waived its right to sovereign immunity from suit. The evidence is all to the contrary.

Sanderlin points to the following four transactions in which he says Chief Billie, acting as an agent of the Tribe, bound the Tribe in contracts with the Government that waived the Tribe's immunity for Rehabilitation Act claims.

One, in July 1995, the Government awarded the Tribe $189,000 for a drug elimination program. Prior to disbursement, the Government required the Tribe to agree to "prohibit discrimination against handicapped individuals under Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) and implementing regulations at 24 C.F.R. Part 8."

Two, in September 1997, the Government approved the Tribe's request for a Child Care and Development Fund for the period October 1, 1997 through September 30, 1999. By signing the funding request, Chief Billie assured the Government that the Tribe "will comply with section 504 of the Rehabilitation Act ... and all requirements imposed by or pursuant to the Regulation of the Department of Health and Human Services ...," to the end that, "in accordance with Section 504 of that Act and the regulations, no otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any program

or activity for which the Applicant receives Federal financial assistance from the Department."

Three, in June 1997, the Government approved the Tribe as a recipient of Head Start grant funds subject to the terms, conditions and requirements of the application. In his application Chief Billie had assured the Government that the Tribe "will comply with Section 504 of the Rehabilitation Act ..., which prohibits discrimination on the basis of handicaps."

Finally, in February 1998, the Bureau of Indian Affairs agreed to give the Seminole Department of Law Enforcement $320,041 upon the condition that the services funded were to be performed in accordance with, inter alia, federal law.

Sanderlin argues that by accepting federal funds, and agreeing as a condition of their receipt to comply with the Act, Chief Billie voluntarily waived the Tribe's sovereign immunity with respect to disability discrimination suits under the Act. We are unconvinced, however, that the Tribe gave Chief Billie actual or apparent authority to enter into contracts with the Government that would waive the Tribe's sovereign immunity for Rehabilitation Act suits. Tribal Ordinance C-01-95 deals specifically with the Tribe's sovereign immunity and how a waiver may be effected by tribal leaders.[1] The Ordinance provides in relevant part:

> WHEREAS, the Seminole Tribe of Florida, as an aspect of its sovereignty, is entitled to immunity from suit in all state and federal courts absent the clear, express and unequivocal consent of the Seminole Tribe of Florida or the clear, express and unequivocal consent of the United States Congress; and

> WHEREAS, the Seminole Tribe of Florida desires to make clear to all persons having business or otherwise dealing with the Seminole Tribe of Florida, its subordinate economic and governmental units, its tribal officials, employees and authorized agents that the Seminole Tribe of Florida does not under any circumstances intend to voluntarily waive its entitlement to immunity from suit in state and federal courts under the doctrine of tribal sovereign immunity absent strict and complete compliance with the procedures set forth below which shall be the exclusive method for effecting a voluntary tribal waiver of sovereign immunity; and

> WHEREAS, the Tribal Council has reviewed this Ordinance and it is otherwise fully advised.

> BE IT FURTHER ORDAINED: that the consent of the Seminole Tribe of Florida to waive its immunity from suit in any state or federal court may only be accomplished through the clear, express and unequivocal consent of the Seminole Tribe of Florida *pursuant to a resolution duly enacted by the Tribal Council of the Seminole Tribe of Florida sitting in legal session.* Any such resolution purporting to waive sovereign immunity as to the Seminole Tribe of Florida, any of its subordinate economic or governmental units or any of its tribal officials, employees or authorized agents shall specifically acknowledge that the Seminole Tribe of Florida is waiving its sovereign immunity on a limited basis and describe the purpose and extent to which such waiver applies. The failure of the Tribal Council resolution to contain such language shall render it ineffective to constitute a waiver of tribal sovereign immunity.

---

[1]This ordinance was approved by the U.S. Department of the Interior's Bureau of Indian Affairs, which supervises the Government's relationship with Native American tribes.

(emphasis added).  In the same vein, Article V, section 9(a) of the Tribal Constitution states:

> No authorities contained in this Constitution may be delegated by the Seminole Tribal council to tribal officials, district councils, or associations to carry out any function for which the Tribal Council assumes primary responsibility, except by ordinance or resolution duly enacted by the Tribal council in legal session, and excepting also those specific requirements contained in the Bylaws of the Seminole Tribe of Florida.

Sanderlin has not pointed to any duly-enacted tribal resolution purporting to effect a waiver in these circumstances.  Nor has Sanderlin pointed to any ordinance or resolution enacted by the Tribal Council granting authority to Chief Billie to waive sovereign immunity for Rehabilitation Act suits on behalf of the Tribe in connection with a request for federal funds.  Indeed, according to Mary Jane Willie, Official Tribal Clerk of the Seminole Tribe of Florida:

> Based upon my search of the official records of the SEMINOLE TRIBE OF FLORIDA, there is no resolution, ordinance or other official document or record evidencing any voluntary consent on the part of the SEMINOLE TRIBE OF FLORIDA or any of its subordinate governmental and economic units to be subject to suit in any state or federal court for any claim brought by or on behalf of any present or former tribal employee relative to issues arising under the Rehabilitation Act of 1973 or any other act relating to discrimination on the basis of race, religion, gender, national origin, age or disability arising under any federal or state statute.

Willie Aff. ¶ 4(b).  Similarly, Tribal Council member Max Osceola states:

> At no time and under no circumstances during my service as a Tribal Council member has the Tribal Council approved or been requested to consider waiving its sovereign immunity in favor of any employee or former employee or any other person relative to any alleged violation arising under the Rehabilitation Act of 1973.  To the best of my knowledge, at no time prior to my service as a Tribal Council member did any prior Tribal Council agree to waive the SEMINOLE TRIBE's sovereign immunity relative to alleged violations of the Rehabilitation Act of 1973.

Osceola Aff. ¶ 14(b).

Chief Billie did not have actual or apparent authority to waive voluntarily the Tribe's sovereign immunity from Rehabilitation Act suits.  Chief Billie did not somehow become vested with the power to waive that immunity simply because he had the actual or apparent authority to sign applications on behalf of the Tribe for federal funding.  Such a finding would be directly contrary to the explicit provisions of the Tribal Constitution and Tribal Ordinance C-01-95 which expressly set forth how, when, through whom, and under what circumstances the Seminole Tribe may voluntarily waive its immunity.  Not one of the Florida law cases cited by Sanderlin discusses agency principles as they might be applied to a Native American tribe's assertion of sovereign immunity in a lawsuit in a federal court arising under federal law.  Extending authority to waive sovereign immunity to a single individual, at least in this context, would be directly contrary to the Supreme Court's clear statement that "a waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106

(1978) (quoting *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976)).

There is a further flaw in Sanderlin's waiver argument. The Tribe argues that even if Chief Billie were somehow acting with the authority to waive the Tribe's immunity from Rehabilitation Act suits, the applications for federal funds in which he agreed that the Tribe would follow federal civil rights laws did not effect such a waiver. According to the Tribe, a certification or assurance of compliance given by or on behalf of a Native American tribe with respect to certain laws is not tantamount to a clear and unmistakable waiver of tribal sovereign immunity with regard to a claim brought under such laws.

The Tribe points for support to *Dillon v. Yankton Sioux Tribe Housing Authority,* 144 F.3d 581 (8th Cir.1998). In *Dillon* the plaintiff alleged that the defendant tribe fired him on the basis of race in violation of federal civil rights statutes. The tribe moved to dismiss on the ground of sovereign immunity. As does Sanderlin in this case, Dillon argued that "because the Authority receives federal financial assistance from the Department of Housing and Urban Development (HUD), and thereby must agree to comply with federal civil rights laws, it has waived sovereign immunity.... [I]t would be incongruous for the Authority to agree to follow federal law, yet shield itself from suit in federal court." 144 F.3d at 583. The Eighth Circuit rejected this argument, holding that the taking of federal funds, even when accompanied by an agreement not to discriminate in violation of federal laws, does not necessarily effect a waiver of tribal sovereign immunity for suits brought under those laws.

> Dillon suggests that because the Authority entered into an agreement with HUD and promised to abide by various civil rights statutes, it effectively waived its sovereign immunity. In its agreement with HUD, the contract signed by the Authority specifically provides that "[a]n Indian Housing Authority established pursuant to tribal law shall comply with applicable civil rights requirements, as set forth in Title 24 of the Code of Federal Regulations." [ ] There is no provision in these regulations, however, mandating a waiver of sovereign immunity when a tribal housing authority enters into an agreement with HUD. Because the Authority did not explicitly waive its sovereign immunity, we lack jurisdiction to hear this dispute.

144 F.3d at 584.

This reasoning is sound. Even if Chief Billie did have authority to waive the Tribe's sovereign immunity from Rehabilitation Act suits, there is no evidence that he did so in this case. The contracts for federal financial assistance in which Billie promised that the Tribe would not discriminate in violation of federal civil rights laws merely convey a promise not to discriminate. They in no way constitute an express and unequivocal waiver of sovereign immunity and consent to be sued in federal court on the specific claim alleged by Sanderlin. *See id.* The Tribe, simply put, did not voluntarily waive its sovereign immunity.

B.

We are equally unconvinced by Sanderlin's argument that Congress abrogated the Tribe's sovereign immunity by enacting certain provisions of the Rehabilitation Act. "Congress may abrogate a sovereign's immunity only by using statutory language that makes its intention unmistakably clear." *Seminole Tribe,* 181 F.3d at 1242; *see also Florida Paraplegic Ass'n,* 166 F.3d at 1131 ("Congress abrogates tribal immunity only where the definitive language of the statute itself states an intent either to abolish Indian tribes' common law immunity or to subject tribes to suit under the act."). Sanderlin argues that through the Rehabilitation Act Congress made the acceptance of federal funds conditional upon a waiver of sovereign immunity. He relies for support on two cases that have no precedential effect on this court: *Cruz v. Ysleta Del Sur Tribal Council,* 842 F.Supp. 934 (W.D.Tex.1993), and *Frost v. Seminole Tribe of Florida,* No. 94-7001-CIV-Roettger (S.D.Fla. July 3, 1995) (unpub.op). As discussed below, these cases—like Sanderlin's own argument—appear to misconstrue the relevant statutory language.

In relevant part, the Rehabilitation Act prohibits discrimination based on disability in any program or activity receiving federal financial assistance. *See* 29 U.S.C. § 794(a). The Act defines "program or activity" to include "a department, agency, special purpose district, or other instrumentality of a State or of a local government." *Id.* § 794(b)(1)(A). The Act defines "local agency" as:

> an agency of a unit of general local government or *of an Indian tribe* (or combination of such units or tribes) *which has an agreement with the designated State agency to conduct a vocational rehabilitation program under the supervision of such State agency in accordance with the State plan approved under section 721 of this title.* Nothing in the preceding sentence of this paragraph or in section 721 of this title shall be construed to prevent the local agency from arranging to utilize another local public or nonprofit agency to provide vocational rehabilitation services if such an arrangement is made part of the agreement specified in this paragraph.

29 U.S.C. § 705(24) (emphasis added).[2]

Sanderlin contends that a Native American tribe such as the Defendant (or more accurately, the SDLE) is by definition a "local agency" subject to the Act. That is also the key assumption made by the district courts in *Cruz* and *Frost.* In fact, however, not all Native American tribes or subdivisions thereof are deemed a local agency. Rather, the definition only extends to "an agency of ... an Indian tribe ... *which has an agreement with the designated State agency to conduct a vocational rehabilitation program under the supervision of such State agency in accordance with the Sate plan approved under section 721 of this title.*"

---

[2] Section § 721 states in pertinent part: "To be eligible to participate in programs under this subchapter [29 U.S.C.A. § 720, *et seq.*], a State shall submit to the Commissioner a State plan for vocational rehabilitation services that meets the requirements of this section, on the same date that the State submits a State plan under section 2822 of this title." 29 U.S.C. § 721(a)(1)(A).

*Id.* (emphasis added).

There is no evidence that the Tribe or any subdivision thereof has an agreement with a state agency for a vocational rehabilitation program pursuant to § 721. On the contrary, the Tribe presents several affidavits in support of the proposition that it does not have any agreements with any state agency to conduct a vocational rehabilitation program under the supervision of the state agency in accordance with a state plan approved under § 721. Willie states in her affidavit that:

> Based on my search of the official records of the SEMINOLE TRIBE OF FLORIDA, there is no resolution, ordinance or other official document or record which evidences that the SEMINOLE TRIBE OF FLORIDA has any agreement with any state agency of the State of Florida or any other state designated pursuant to 29 U.S.C. § 721 to conduct a vocational rehabilitation program under the supervision of such state agency in accordance with a state plan approved under 29 U.S.C. § 721.

Willie Aff. ¶ 4(a). Similarly, Osceola states in his affidavit:

> At no time and under no circumstances during my service as a Tribal council member was the Tribal Council of the SEMINOLE TRIBE requested to consider approving any agreement with any state agency of any state designated pursuant to 29 U.S.C. § 721(a)(1) to conduct a vocational rehabilitation program under the supervision of such state agency in accordance with any state plan approved under 29 U.S .C. § 721. To the best of my knowledge, at no time prior to my service as a Tribal Council member was the Tribal Council ever asked to consider approving such an agreement.

Osceola Aff. ¶ 14(a). The Tribe, therefore, is not within the scope of those entities as to which Congress may have sought to abrogate sovereign immunity.

*Cruz* and *Frost* are unhelpful to Sanderlin because those decisions appear to ignore the full definition of "local agency," focusing instead solely on the reference to "Indian tribe." In *Cruz,* the plaintiff sued the Tigua Indian Tribe alleging that the tribe discriminated against her in violation of the Rehabilitation Act. The tribe moved to dismiss for sovereign immunity. The district court, with virtually no analysis, held that "the claim of tribal immunity cannot be sustained." 842 F.Supp. at 935. The only reasoning the court gave for its conclusion was that the term local agency is defined by the Act to include an Indian tribe. Likewise in *Frost,* the plaintiff alleged that the Seminole Tribe discharged her from her job in the Seminole Indian Bingo Hall because of a disability in violation of the Rehabilitation Act. The district court denied the tribe's motion to dismiss, following *Cruz* and stating that "[h]aving expressly mentioned Indian tribes by including agencies of Indian tribes within the definition of local agencies, Congress has expressed a clear intent to invade tribal independence in the Rehabilitation Act of 1973, as amended. Accordingly, Congress has waived tribal immunity." Order at 2. For the reasons discussed above, that logic is incomplete because it appears to ignore the full definition of local agency.

Sanderlin, for his part, does not actually assert that the Tribe conducted a vocational rehabilitation program under the supervision of the state, but insists that the Tribe nevertheless comes within the definition of local agency because it requested Government funds for its Head Start program to facilitate the hiring of a Disability Coordinator. Without any explanation, Sanderlin states that the hiring of a disability coordinator "clearly constitutes 'utilizing another local public or nonprofit agency to provide rehabilitation services.' " This argument is to no end. The language highlighted by Sanderlin is not part of the definition of local agency, but rather is derived from the additional clause in § 705(24), which refers to the definitional sentence and then adds as a caveat: "Nothing in the preceding sentence ... shall be construed to prevent the local agency from arranging to utilize another local public or nonprofit agency to provide vocational rehabilitation services ...." This language does not purport to expand the definition of local agency in the manner Sanderlin suggests. In any event, to the extent that the relevant language of the Rehabilitation Act is ambiguous as to its coverage and effect on tribal sovereignty, any ambiguity must be resolved in favor of the Tribe. *See White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143-44, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980) ("Ambiguities in federal law have been construed generously in order to comport with ... traditional notions of sovereignty and with the federal policy of encouraging tribal independence."); *Seminole Tribe,* 181 F.3d at 1242 ("ambiguities in federal laws implicating Indian rights must be resolved in the Indians' favor").

Sanderlin has pointed to no express provision in the Rehabilitation Act unmistakably demonstrating that Congress intended to abrogate tribal sovereign immunity in these circumstances. In the absence of such an unequivocal expression of legislative intent to abrogate, this Court must find the Tribe is protected by sovereign immunity. *See Santa Clara Pueblo,* 436 U.S. at 59, 98 S.Ct. 1670; *Seminole Tribe,* 181 F.3d at 1241-42 ("Congress abrogates tribal immunity only where the definitive language of the statute itself states an intent either to abolish Indian tribes' common law immunity or to subject tribes to suit under the act"). This holding is entirely consistent with our precedent in related contexts. In *Florida Paraplegic Association,* for example, we held that "[n]either the enforcement provision of Title III of the ADA nor the parallel section of the Civil Rights Act specifically authorizes suits against Indian tribes who allegedly have violated the Acts' substantive requirements [against disability discrimination].... Congress declined to abrogate Indian tribes' sovereign immunity from suit either by direct statement in Title III itself or by reference to other statutes having that effect. No support exists in the statute for a finding that Congress has waived tribal sovereign immunity under Title III of the ADA." 166 F.3d at 1132.

Sanderlin asserts in a footnote that the Court should find Congressional abrogation in this case by interpreting the Rehabilitation Act to be a statute of broad general application that must be read to cover, *inter alia,* Native American tribes. For this argument he relies on *Federal Power Commission v. Tuscarora Indian Nation,* 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960). *Tuscarora* involved whether the Power Authority of the State of New York could take by eminent domain a portion of the Tuscarora's lands pursuant to a federal license issued to the power authority to condemn lands in accordance with the conditions of the Federal Power Act. The Supreme Court addressed whether section 21 of that statute, which authorized the condemnation of lands or property of others necessary to the construction, maintenance, or operation of any licensed project, applied to Native American lands. The Court held that the eminent domain powers of the statute did apply. According to the Court: "[I]t is now well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests." *Id.* at 116, 80 S.Ct. 543.

The bare proposition that broad general statutes have application to Native American tribes does not squarely resolve whether there was an abrogation of tribal immunity in this particular instance. First, as explained above, case law since *Tuscarora* has made clear that any purported abrogation must be express and unequivocal. *See, e.g., Florida Paraplegic Ass'n,* 166 F.3d at 1130-34 (holding that the absence of any reference to the amenity of Native American tribes to suits under the ADA meant that the statute did not abrogate tribal sovereign immunity, notwithstanding *Tuscarora* ). Second, unlike section 21 of the Federal Power Act at issue in *Tuscarora,* in this case the Rehabilitation Act does expressly reference when the Act is to apply to Native American tribes; and by its terms, the Act does *not* apply to those tribes that do not have an agreement with a designated state agency to conduct a vocational rehabilitation program. We cannot say that Congress abrogated tribal immunity in this instance. Accordingly, the Tribe's sovereign immunity deprives the district court of subject matter jurisdiction over Sanderlin's complaint.

IV.

Sanderlin raises two other issues on appeal. First, he challenges the district court's denial of his motion for reconsideration. "Motions for reconsideration should not be used to raise legal arguments which could and should have been made before the judgement was issued. Denial of a motion for reconsideration is 'especially sound[ ] when the party has failed to articulate any reason for the failure to raise the issue at an earlier stage in the litigation.' " *Lockard,* 163 F.3d at 1267 (quoting *O'Neal v. Kennamer,* 958 F.2d 1044,

1047 (11th Cir.1992)).

Sanderlin argues the district court abused its discretion in denying his motion to reconsider, in which he asked the court to take into account admissions made by the Tribe in response to his motion to compel. Sanderlin argues that in its response the Tribe admitted that it contracts to perform services for the Government. Sanderlin contends that these admissions were unavailable to the district court prior to its order dismissing the complaint, and would have altered that ruling if considered.

There are several defects in Sanderlin's position. To begin with, it is not at all clear how the Tribe's supposed admissions in its response to Sanderlin's motion to compel are relevant to the jurisdictional question. In its response the Tribe simply stated:

> Any federal money referred to in the [Tribe's 1998] Budget is merely a projected possible source of earned income pursuant to contacts between the SEMINOLE TRIBE and the federal government under Public Law 93-638 under which the SEMINOLE TRIBE is paid to assume duties previously provided by the federal government. Under so-called 638 Contracts the SEMINOLE TRIBE is deemed to be a part of the federal government.

> In short, the 1998 Budget of the SEMINOLE TRIBE filed under seal for in camera review does not contain information regarding the application or receipt of federal financial assistance funds and as Sanderlin's theory of jurisdiction rests on the receipt of federal financial assistance funds and as discovery is limited to jurisdiction, Sanderlin's demand for the 1998 Budget is clearly beyond the purview of allowable discovery in this matter.

The fact that the Tribe may have received federal funds pursuant to a "638" contract does not affect the analysis here, which concerns whether the Tribe waived its sovereign immunity for Rehabilitation Act suits or whether Congress in the Act abrogated tribal immunity for suits brought under the Act. Moreover, the district court had ample time to consider the significance of the Tribe's "admissions" because in actuality the Tribe's response was filed *before* the district court entered its order of dismissal.[3] Although Sanderlin suggests that his motion to reconsider presented the district court with new evidence, that suggestion is unfounded. *Cf. Mays v. United States Postal Serv.,* 122 F.3d 43, 46 (11th Cir.1997) (per curiam) (holding that where a party attempts to introduce previously unsubmitted evidence as part of a motion to reconsider, the court should not grant relief absent some showing that the evidence was unavailable during the pendency of the original motion). The district court did not commit reversible error by denying Sanderlin's motion for reconsideration.

Sanderlin's final objection on appeal concerns the district court's denial as moot of his motion to

---

[3]The Tribe's response to the motion to compel was filed on December 14, 1999. The district court dismissed the case and denied all pending motions on December 21, 1999.

compel the Tribe to produce the 1998 tribal budget. In Request No. 3 of his Request for Production, Sanderlin sought "[a]ny and all Budgets and/or Accountings which reflect receipt of United States Government financial assistance funds by the Seminole Tribe of Florida for the years 1994 to the present."[4] The Tribe responded to the request but did not produce its budget for 1998, prompting Sanderlin to file his motion. Thereafter, the Tribe provided its 1998 budget to the district court for an in camera review. The Tribe adhered to its argument, however, that the 1998 budget was unresponsive to Request No. 3 because the budget did not reflect the receipt of any federal financial assistance.[5]

We find no reversible error in the district court's handling of Sanderlin's motion. The district court had adequate opportunity to examine the 1998 tribal budget (which it possessed for in camera review) and to determine whether that document was responsive to Sanderlin's request, and more to the point, whether it would affect the jurisdictional analysis. If the district court felt that the budget would have altered its decision to dismiss the case, we are confident that the court would have considered it further. For our part, the 1998 budget does not appear to be either clearly responsive to the production request or decisive of the dispositive threshold question of jurisdiction. *See Burger King,* 169 F.3d at 1320 (" '[A] district court can deny a motion to compel further discovery if it concludes that the questions are irrelevant' ") (quoting *Commercial Union Ins. Co. v. Westrope,* 730 F.2d 729, 732 (11th Cir.1984)).

For all of the foregoing reasons, the district court properly dismissed this action for lack of jurisdiction, and did not commit reversible error by denying Sanderlin's motion for reconsideration and his motion to compel. We therefore affirm.

AFFIRMED.

---

[4]By mutual consent, the parties agreed to limit the scope of Sanderlin's document requests to 1998, the year during which Sanderlin was discharged.

[5]The Tribe argued (as it does now on appeal) that the 1998 budget was unresponsive to Sanderlin's discovery request because the budget does not refer to the receipt of federal financial assistance, and only makes reference to anticipated but as-yet-unreceived federal funds pursuant to 638 contracts with the Government.