**UNITED STATES of America, Appellant,**

v.

**The WASHINGTON POST COMPANY et al.**

**No. 71–1478.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 18, 1971.

Decided June 19, 1971.

As Amended June 22, 1971 and July 2, 1971.

See also D.C.Cir., 446 F.2d 1327.

Mr. Kevin T. Maroney, Atty., Department of Justice, with whom Messrs. Thomas A. Flannery, U. S. Atty., and Daniel J. McAuliffe, Atty., Department of Justice, were on the pleadings for appellant. Messrs. John A. Terry and Joseph M. Hannon, Asst. U. S. Attys., also entered appearances for appellant.

Mr. Roger A. Clark, Washington, D. C., with whom Messrs. Anthony F. Essaye and William C. Potter, Jr., Washington, D. C., entered appearances, on behalf of appellees.

Before WRIGHT, ROBINSON and ROBB, Circuit Judges.

PER CURIAM:

Very early this morning, we entered an order in this case summarily reversing an order of the District Court denying appellant, the Government, a temporary restraining order. We now summarize the reasons for the action we deemed necessary in the unusual circumstances with which we were confronted.

Appellees, the Washington Post Company and certain of its officers, are in possession of portions of a 47-volume "top secret" document known as the "History of U.S. Decision-Making Process on Vietnam Policy." Yesterday they published information derived from that document, and admittedly intend to publish more. The Government filed in the District Court a complaint and affidavits of responsible officials claiming that publication of material from the document has prejudiced and will prejudice the conduct of the Nation's military efforts and diplomatic relations, and will result in irreparable harm to the national defense. Appellees claim that the material is historical in character, that its publication therefore cannot reasonably be expected to prejudice defense interests though it may embarrass both governments and individuals, and that the First Amendment protects their right to publish it.

About 8:00 p. m. yesterday, the District Court denied the Government's request for a temporary restraining order to prevent further publication of this material by appellees. In its memorandum opinion, the Court expressed the views that the Supreme Court's opinion in Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), supported total freedom of the press, and that criminal sanctions were the Government's only remedy for publication of classified information. The court also said that it had no precise indication of how publication of the material would injure the United States; it felt that other parties may also have copies of the document and may divulge its contents to other sources, so that judicial intervention might ulti-

mately be futile. The court was also concerned that even after a full hearing, it might not be able to weigh the conflicting private, public and governmental interests in secrecy and freedom of the information.

We have concluded that the District Court's action was improper. In the first place, freedom of the press, as important as it is, is not boundless. The *Near* case relied on so heavily by the District Court involved a broad scheme for injunctions against "obscene, lewd and lascivious" or "malicious, scandalous and defamatory" publications. In the Supreme Court's opinion, that scheme was clearly a prior restraint on the press prohibited by the First Amendment. But *Near* recognized a narrow area, embracing prominently the national security, in which a prior restraint on publication might be appropriate. *See* 283 U.S. at 715–716, 51 S.Ct. 625, 75 L.Ed. 1357. We think the instant case may lie within that area.

Second, the District Court placed questionable reliance on the traditional rule that equity will not enjoin conduct amounting to crime. The principle is a corollary of the more general principle that equitable relief is inappropriate where there is an adequate remedy at law. The Supreme Court has recognized exceptions to the rule against injunctions to prevent crimes in cases where an important public interest was threatened with irreparable harm. *See* In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895). Section 1(b) of the Internal Security Act of 1950 indicates that the criminal sanctions which the Act provides for dissemination of classified information are not to be construed as establishing military or civilian censorship. 64 Stat. 987; *see* 18 U.S.C. § 793 (1964). But it is hardly clear that Congress thereby meant to foreclose all possible resort to injunctive relief to protect such information in such exceptional circumstances as would justify prior restraints under *Near*.

Thus we think the law permits an injunction against publication of material vitally affecting the national security. In this case, the Government makes precisely that claim—that publication by appellees will irreparably harm the national defense. The District Court nevertheless found that the Government had not advanced even a basis for a temporary restraint to determine whether there is any merit to its claim. Under the circumstances, we think that the District Court erred in that ruling.

We are aware that the Government has not set forth particular elements of prejudice to the national defense, and that the document in question covered a period which ended over three years ago. But we also recognize that the Government may not have been able to make specific allegations without knowing precisely what parts of the document are held by appellees, and that there is an interest in avoiding disclosure of classified information even in court where such disclosure is not crucial to the court's decision. *See* United States v. Reynolds, 345 U.S. 1, 8–10, 73 S.Ct. 528, 97 L.Ed. 727 (1953). The document is admittedly a review of the conduct of military and diplomatic affairs with respect to a war which continues into the present. And the Government did present affidavits of officials in a position to know what sort of harm might result from publication of material derived from the document. These circumstances do not provide a sufficient basis for determining, one way or the other, whether all of the document is essentially historical in character or whether any of it has a present impact on vital matters affecting national security. We do not understand how it can be determined without a hearing and without even a cursory examination of the material that it is nothing but "historical data" without present vitality.

While we are advertent to the heavy burden the Government bears to demonstrate ample justification for any restraint on publication, we are unable to

escape the conclusion that the denial of a temporary restraining order may possibly threaten national security. Judicial responsibility, in our view, cannot properly be discharged without some inquiry into the matter. The Government does not ask us to accept its allegations, but only to afford it an opportunity to prove them. While appellees will be delayed by a grant of relief, and while courts should always hesitate to restrain free expression, the injury to appellees from a brief pause in publication is clearly outweighed by the grave potentiality of injury to the national security.

Under these circumstances, we felt compelled to reverse the decision of the District Court, and to restrain publication for the shortest possible period consistent with an opportunity for the Government to substantiate its claims at a hearing on its request for a preliminary injunction.

Reversed.

J. SKELLY WRIGHT, Circuit Judge (dissenting):

This is a sad day for America. Today, for the first time in the two hundred years of our history, the executive department has succeeded in stopping the presses. It has enlisted the judiciary in the suppression of our most precious freedom. As if the long and sordid war in Southeast Asia had not already done enough harm to our people, it now is used to cut out the heart of our free institutions and system of government. I decline to follow my colleagues down this road and I must forcefully state my dissent.

The executive department has sought to impose a prior restraint on publication of a series of articles by the *Washington Post*. The District Court refused to cooperate. Very basic constitutional principles support the District Court's decision.

In Near v. Minnesota, 283 U.S. 713, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), Mr. Chief Justice Hughes spoke for the Supreme Court and stated that imposition of prior restraints upon publishing is "the essence of censorhip." *Id.* at 713, 51 S.Ct. 625. He quoted Blackstone, the father of our common law liberties, and Madison, the father of our Constitution, to the effect that prior restraints on speech and press constitute the most heinous encroachment on our freedom. In the early days, Americans such as Madison had hoped that their country would not follow the repressive course of England. "Here, as Madison said, 'the great and essential rights of the people are secured against legislative as well as executive ambition. They are secured, not by laws paramount to prerogative, but by constitutions paramount to laws. This security of the freedom of the press requires that it should be exempt not only from previous restraint by the Executive, as in Great Britain, but from legislative restraint also.' " *Id.* at 714, 51 S.Ct. at 630.

Under the First Amendment of our Constitution, prior restraints upon speech and press are even more serious than subsequent punishment. There is no question as to the extent of the deterrent effect. A restraining order, imposed by a court, applies directly against a particular individual or newspaper and carries very specific and very severe penalties for contempt. It is imposed before the speech at issue has even seen the light of day. As in this case, it is imposed even before the judges have read the offending material—imposed quite literally in the dark. The weapon of the prior injunction is a weapon long unused, but potentially deadly.

It is said that a temporary restraining order suppresses free speech only for a few days, and what is the hurry? That argument, in my opinion, cheapens the First Amendment. All of the presumptions must run in favor of free speech, not against it. Certainly before a prior restraint can be placed on the press, even for a short time, there must be a showing of substantial and specific injury suffi-

cient to override strong First Amendment interests.

Thus we arrive at the key issue here. The burden is on the Government. Clearly, there are *some* prospective harms which might conceivably justify a prior restraint on speech or press. But those harms are very exceptional and must be very convincingly established by the party seeking an injunction. The *Near* Court recognized as much and said:

> the protection even as to previous restraint is not unlimited. But the limitation has been recognized only in exceptional cases: * * * No one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops. On similar grounds, the primary requirements of decency may be enforced against obscene publications. The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government. The constitutional guaranty of free speech does not "protect a man from an injunction against uttering words that may have all the effect of force."

*Id.* at 716, 51 S.Ct. at 631.

In this case, the executive department has made no allegations—to say nothing of convincing showings—that troop movements or recruitment are threatened. Neither obscenity nor overthrow of the government is at issue. All that is at issue is what the District Court termed "essentially historical data." It is at least three years old and as much as twenty years old. It records the plans and policies of bygone days; it does not reveal the current plans of the present administration which, by its own account, is pursuing a different policy.

Since we are dealing with "essentially historical data," the executive department has an even greater burden to suggest what specific sort of harm may result from its publication. Yet it seeks to suppress history solely on the basis of two very vague allegations: (1) the data has been classified as "top secret," because (2) the data is said to adversely affect our national security. These allegations are made in *completely conclusory fashion* in the only two affidavits submitted to this court. The affidavits contain *no facts* whatever to support the conclusions or to specify the anticipated harms. Of course, the Government may not know precisely which documents the *Post* has. But it has identified the 47-volume report from which the documents are taken. The Government could suggest and support at least *one* specific harm that would result from publication of *anything* in the 47 volumes. It has not even done that.

With the sweep of a rubber stamp labelled "top secret," the executive department seeks to abridge the freedom of the press. It has offered no more. We are asked to turn our backs on the First Amendment simply because certain officials have labelled material as unfit for the American people and the people of the world. Surely, we must demand more. To allow a government to suppress free speech simply through a system of bureaucratic classification would sell our heritage, far, far too cheaply.

It is said that it is better to rely on the judgment of our government officials than upon the judgment of private citizens such as the publishers of the *Washington Post*. Again, that misses the point. The First Amendment is directed against one evil: suppression of the speech of private citizens by government officials. It embodies a healthy distrust of governmental censorship. More importantly, it embodies a fundamental trust of individual Americans. Any free system of government involves risks. But we in the United States have chosen to rely in the end upon the judgment and true patriotism of all the people, not only of the officials.

This case would seem to be a good illustration. As the District Court said, a detailed account of our initiation and prosecution of the war in Vietnam "unquestionably will be embarrassing to the United States." But that is due to the nature of the history, not to the nature of the account. Surely, mere "embarrassment" is not enough to defeat First Amendment rights. Indeed, it may be a necessary part of democratic self-government. At a time when the American people and their Congress are in the midst of a pitched debate over the war, the history of the war, however disillusioning, is crucial. The executive department, which brought us into the war and which would be primarily "embarrassed" by publication of the material in question, must not be allowed to bury that history at such a time. Democracy works only when the people are informed.

Whatever temporary damage may come to the image of this country at home and abroad from the historical revelations in these Pentagon Papers is miniscule compared to the lack of faith in our government engendered in our people from their suppression. Suppression breeds suspicion and speculation. I suggest the truth is not nearly so devastating as the speculation following suppression. We are a mature people. We can stand the truth.

Thus, in my view, the Government faces a very great burden of justification in this case. It has sought to meet that burden with general allegations about national security and "top secret" classifications. It suggests that it may have more specific allegations, but refuses even to hint at them until we bend to its will and grant a temporary restraining order. I refuse to act on such a basis. I believe that the Government has not met its burden—it has not even come close. In that circumstance, I feel duty and honor bound to vote to affirm the decision of the District Court.

I respectfully dissent.