PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
07/20/99
THOMAS K. KAHN
CLERK

No. 97-5361

D.C. Docket No. 96-Civ-2063-UUB

STATE OF FLORIDA,

Plaintiff-Appellant,

versus

SEMINOLE TRIBE OF FLORIDA,
JAMES E. BILLIE, Chairman,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Florida

**(July 20, 1999)**

Before TJOFLAT and EDMONDSON, Circuit Judges, and KRAVITCH, Senior
Circuit Judge.

TJOFLAT, Circuit Judge:

This case, which involves alleged class III tribal gaming activity as defined by the Indian Gaming Regulatory Act ("IGRA"),[1] demonstrates the continuing vitality of the venerable maxim that turnabout is fair play. In 1994, we held that the principle of state sovereign immunity embodied in the Eleventh Amendment barred the Seminole Tribe of Florida ("the Tribe") from suing the State of Florida under 25 U.S.C. § 2710(d)(7)(A)(i) (1994) for the State's alleged failure to negotiate in good faith regarding the formation of a Tribal-State compact to regulate class III gaming. See Seminole Tribe v. Florida, 11 F.3d 1016, 1029 (11th Cir. 1994), aff'd, 517 U.S. 44, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996). In this case, the State has sued the Tribe and its Chairman, James E. Billie, for both a declaration that the Tribe is conducting unauthorized class III gaming operations and an injunction preventing such operations in the absence of a Tribal-State compact. The district court granted the Tribe's motion to dismiss on the ground of tribal sovereign immunity, and granted Chairman Billie's motion to dismiss for failure to state a claim upon which relief can be granted. We affirm.

---

[1] Pub. L. No. 100-497, 102 Stat. 2467 (1988) (codified at 25 U.S.C. §§ 2701-21 (1994)). For a general discussion of the three classes of tribal gaming established by the litigation-spawning juggernaut known as IGRA, see Seminole Tribe v. Florida, 11 F.3d 1016, 1019 (11th Cir. 1994).

## I.

The relevant facts may be briefly stated. The State commenced this action on July 29, 1996, and filed its amended complaint – the pleading at issue here – on September 9. In this complaint, the State alleged[2] that the Tribe was operating "electronic or electromechanical facsimiles of games of chance" and that such operations constituted class III gaming as defined by IGRA. See 25 U.S.C. § 2703(7)(B)(ii), (8) (1994). The Tribe operated these games despite the absence of a compact between the Tribe and the State regarding the regulation of class III gaming. The State also alleged that the Tribe planned to construct a new facility on its lands in order to conduct additional class III gaming.

According to the State's complaint, the operation of such games without a Tribal-State compact violates both federal and state law. In support of this claim, the State first points to IGRA's rule that "[c]lass III gaming activities shall be lawful on Indian lands only if such activities are . . . conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under [section 2710(d)(3)] that is in effect." 25 U.S.C. § 2710(d)(1)(C) (1994). Second, the State contends that the Tribe's games are "gambling devices" within the

___

[2] We accept the factual allegations of the State's amended complaint as true in reviewing the defendants' motion to dismiss. See Jackson v. Okaloosa County, Fla., 21 F.3d 1531, 1534 (11th Cir. 1994).

meaning of 15 U.S.C. § 1171(a) (1994), and thus that 15 U.S.C. § 1175(a) (1994) makes it a crime to possess or use them within Indian country. IGRA creates an exception to this prohibition by providing that section 1175 "shall not apply to any gaming conducted under a Tribal-State compact that – (A) is entered into . . . by a State in which gambling devices are legal, and (B) is in effect." 25 U.S.C. § 2710(d)(6) (1994). The State argues, however, that this exception is inapplicable both because it has no compact with the Tribe and because the Tribe's games constitute illegal "slot machines" under Florida law. See Fla. Stat. ch. 849.15-16 (1997) (making it a crime, inter alia, to "possess" or "permit the operation of" such machines). Finally, the State contends that the Tribe has committed additional federal crimes by violating this state-law ban on slot machines, which applies to the Tribe's lands for purposes of federal law. See 18 U.S.C. § 1166 (1994) (applying state laws regulating or prohibiting gambling to Indian country for purposes of federal law, defining – by reference to state gambling laws – independent federal offenses involving gambling in Indian country, and granting the United States exclusive jurisdiction over criminal prosecutions for violating state gambling laws unless a tribe consents to state jurisdiction); 18 U.S.C. § 1955 (1994) (criminalizing a "gambling business" conducted in violation of state law).

Based on these factual allegations and arguments, the State asked the district court to declare that the Tribe was conducting unauthorized class III gambling operations in the absence of a Tribal-State compact, and to enjoin the Tribe from conducting any such operations without a compact.[3] On October 10, 1996, the Tribe and Chairman Billie moved to dismiss the State's amended complaint on the following grounds: tribal sovereign immunity, lack of standing, and failure to state a claim. The district court granted this motion on June 15, 1997. The court found that the State's action was barred as to the Tribe because the Tribe had not expressly agreed to waive its sovereign immunity. The court also concluded that the State had failed to state a claim against Chairman Billie because there was no

---

[3] The State's amended complaint also contained a second count in which it sought a declaration either that IGRA did not preempt or repeal the State's criminal jurisdiction (derived from former Section 7 of Public Law 280, 67 Stat. 588, 590 (1953), and Fla. Stat. ch. 285.16 (1997), see generally Seminole Tribe v. Butterworth, 658 F.2d 310, 312-13 (5th Cir. Unit B Oct. 1981)) to prosecute those engaged in illegal gaming on the Tribe's lands or that IGRA, if it did have that effect pursuant to 18 U.S.C. § 1166(d) (1994), violated the Tenth Amendment. Cf. Sycuan Band of Mission Indians v. Roache, 54 F.3d 535, 539-40 (9th Cir. 1994) (finding that section 1166(d) gives the United States exclusive jurisdiction to prosecute violations of state gambling laws in Indian country under certain circumstances despite the jurisdiction previously granted to states under Public Law 280).

The defendants moved to dismiss this count of the State's amended complaint on October 10. The district court granted this motion as to the Tribe on the ground of sovereign immunity, but denied it as to Chairman Billie based on the State's allegation that the Tribe had consented to State jurisdiction over Indian lands in Florida. After conducting an exhaustive review of the evidence supporting this allegation, however, the State voluntarily dismissed this count on July 11, 1997.

implied right of action under IGRA for declaratory or injunctive relief against unlawful class III gaming.  This appeal followed.

## II.

On appeal, the State challenges both the district court's finding of tribal sovereign immunity and its conclusion that the State failed to state a claim against Chairman Billie.  We review the district court's rulings on these two questions of law de novo.[4]  See Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, No. 96-5262, — F.3d —, — (11th Cir. 1999) [slip op. 2751, 2764; June 7, 1999]; Womack v. Runyon, 147 F.3d 1298, 1299 (11th Cir. 1998).

---

[4] In light of our conclusion in part II.B., infra, that the State has failed to state a claim against Chairman Billie, it might be argued that the State has likewise failed to state a claim against the Tribe and therefore that it is unnecessary for us to determine whether the Tribe's sovereign immunity bars this suit.  This argument, however, ignores the fundamentally jurisdictional nature of a claim of sovereign immunity.  See, e.g., United States v. County of Cook, Ill., 167 F.3d 381, 390 (7th Cir. 1999) (noting the Supreme Court's "thoroughgoing equation of sovereign immunity to a jurisdictional shortcoming"); Fletcher v. United States, 116 F.3d 1315, 1326 (10th Cir. 1997) (holding that the Osage Tribal Council and its members "properly and adequately challenged federal jurisdiction on the ground of tribal sovereign immunity"); Kreig v. Prairie Island Dakota Sioux (In re Prairie Island Dakota Sioux), 21 F.3d 302, 305 (8th Cir. 1994) (finding that tribal "sovereign immunity is a jurisdictional consideration separate from subject matter jurisdiction"); Maynard v. Narragansett Indian Tribe, 984 F.2d 14, 16 (1st Cir. 1993) (holding that tribal immunity was not waived or abrogated, and thus that district court correctly dismissed action for lack of jurisdiction); Pan Am. Co. v. Sycuan Band of Mission Indians, 884 F.2d 416, 418 (9th Cir. 1989).  Because of its jurisdictional nature, we must consider the Tribe's claim of sovereign immunity before reaching the issue of failure to state a claim.  Cf. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58-62, 98 S. Ct. 1670, 1677-79, 56 L. Ed. 2d 106 (1978) (deciding first that suit against tribe was barred by sovereign immunity, and then finding that plaintiffs had no implied right of action against tribal official).

A.

"Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S. Ct. 1670, 1677, 56 L. Ed. 2d 106 (1978). A suit against an Indian tribe is therefore barred unless the tribe clearly waived its immunity or Congress expressly abrogated that immunity by authorizing the suit. See Kiowa Tribe v. Manufacturing Techs., Inc., 523 U.S. 751, —, 118 S. Ct. 1700, 1702, 140 L. Ed. 2d 981 (1998); Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 509, 111 S. Ct. 905, 909, 112 L. Ed. 2d 1112 (1991); Florida Paraplegic Ass'n v. Miccosukee Tribe of Indians, 166 F.3d 1126, 1130-31 (11th Cir. 1999).

As we read its briefs on appeal, the State offers three theories to support its argument that the Tribe's sovereign immunity does not bar this suit: (1) Congress abrogated tribal immunity from state suits that seek declaratory or injunctive relief for alleged tribal violations of IGRA; (2) the Tribe, by electing to engage in gaming under IGRA, waived its immunity from a suit to require compliance with the statutory conditions precedent to class III gaming; and (3) tribal immunity does not necessarily extend to actions seeking prospective equitable relief. Although

6

some courts have muddled the distinctions among these theories,[5] they are actually quite different and will be considered separately here.

1.

We have previously held that "Congress abrogates tribal immunity only where the definitive language of the statute itself states an intent either to abolish Indian tribes' common law immunity or to subject tribes to suit under the act." Florida Paraplegic Ass'n, 166 F.3d at 1131. In IGRA, Congress abrogated tribal immunity by authorizing a state to sue a tribe in district court "to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact entered into under [section 2710(d)(3)] that is in effect." 25 U.S.C. § 2710(d)(7)(A)(ii) (1994). The State, citing Mescalero Apache Tribe v. New Mexico, 131 F.3d 1379, 1385-86 (10th Cir. 1997), argues that this provision of

---

[5] See, e.g., Mescalero Apache Tribe v. New Mexico, 131 F.3d 1379, 1385-86 (10th Cir. 1997) (citing cases regarding waiver of tribal immunity as support for proposition that Congress abrogated tribal immunity in IGRA); Ross v. Flandreau Santee Sioux Tribe, 809 F. Supp. 738, 744-45 (D.S.D. 1992) (conflating issues of whether tribe waived sovereign immunity by engaging in gaming under IGRA and whether tribe's immunity extended to action seeking prospective equitable relief).

Some of this confusion may stem from the Santa Clara Pueblo decision, in which the Supreme Court considered whether a particular statutory provision could "be read as a general waiver of the tribe's sovereign immunity" by Congress. 436 U.S. at 59, 98 S. Ct. at 1677 (emphasis added). We believe that it is most conducive to reasoned analysis to have separate terms for a congressional deprivation of tribal sovereign immunity as distinguished from a voluntary tribal relinquishment thereof. In this opinion, therefore, we refer to the former as a congressional abrogation of immunity and to the latter as a tribal waiver of immunity.

IGRA evinces a broad congressional intent to abrogate tribal immunity from any state suit that seeks declaratory or injunctive relief for an alleged tribal violation of IGRA. We disagree.

As an initial matter, we find that Mescalero provides no support for the State's argument. The Mescalero panel, in discussing section 2710(d)(7)(A)(ii), claimed that a majority of courts agree that "IGRA [abrogated[6]] tribal sovereign immunity in the narrow category of cases where compliance with IGRA's provisions is at issue and where only declaratory or injunctive relief is sought." 131 F.3d at 1385. In actuality, however, the cases that the panel cited in support of its claim addressed an entirely different matter, to wit: whether a tribe voluntarily waives its own sovereign immunity by engaging in gaming under IGRA. See infra part II.A.2. (discussing tribal waiver of immunity). In light of this absence of supporting authority, we find the Mescalero panel's claim difficult to credit.

Moreover, we conclude that the panel's claim – and thus the State's argument in favor of a broad reading of section 2710(d)(7)(A)(ii) – directly contradicts two well-established principles of statutory construction: that Congress may abrogate a sovereign's immunity only by using statutory language that makes

---

[6] The Mescalero panel actually used the word "waived." We substitute the word "abrogated" for the reasons discussed in note 5, supra.

8

its intention unmistakably clear,[7] and that ambiguities in federal laws implicating Indian rights must be resolved in the Indians' favor. See Florida Paraplegic Ass'n, 166 F.3d at 1131 (citing Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242, 105 S. Ct. 3142, 3147, 87 L. Ed. 2d 71 (1985); Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S. Ct. 2399, 2403, 85 L. Ed. 2d 753 (1985)). When section 2710(d)(7)(A)(ii) of IGRA is read in light of these principles, it becomes clear that Congress abrogated tribal immunity only in the narrow circumstance in which a tribe conducts class III gaming in violation of an existing Tribal-State compact. Cf. Cabazon Band of Mission Indians v. Wilson, 124 F.3d 1050, 1059-60 (9th Cir. 1997) (concluding that section 2710(d)(7)(A)(ii) did not authorize state's suit to enjoin tribal class III gaming that existing Tribal-State compact did not prohibit). Because the State and the Tribe have not entered into a compact in this case, we hold that Congress has not abrogated the Tribe's immunity from the State's suit.

2.

---

[7] Citations to legislative history or inferences from general statutory language are insufficient bases for a finding of congressional abrogation. See Florida Paraplegic Ass'n, 166 F.3d at 1131.

The State next argues that the Tribe, by electing to engage in gaming subject to regulation under IGRA, waived its own immunity from this suit to compel compliance with IGRA's requirement that the Tribe enter into a Tribal-State compact before conducting class III gaming.  See 25 U.S.C. § 2710(d)(1)(C). There is some support for this argument in the case law.  In Ross v. Flandreau Santee Sioux Tribe, 809 F. Supp. 738, 745 (D.S.D. 1992), for example, the court held that "[e]ngaging in gaming pursuant to the IGRA constitutes an express waiver of sovereign immunity on the issue of compliance with the IGRA."  See also Maxam v. Lower Sioux Indian Community, 829 F. Supp. 277, 281 (D. Minn. 1993) ("The Community's decision to conduct class II gaming pursuant to the IGRA constitutes a clear waiver of sovereign immunity for the purpose of enforcement of the requirements imposed as a statutory condition of permission to engage in such activities.").  But see Davids v. Coyhis, 869 F. Supp. 1401, 1407-09 (E.D. Wis. 1994) (rejecting Ross and Maxam as contrary to the Supreme Court's decision in Santa Clara Pueblo).

The district court in this case, however, concluded that Ross and Maxam were wrongly decided.  We agree.  The Supreme Court has made it plain that waivers of tribal sovereign immunity cannot be implied on the basis of a tribe's

actions, but must be unequivocally expressed.[8]  The State's argument that the

Tribe's gaming activities constitute a waiver of sovereign immunity is patently

inconsistent with this rule.  Although the Ross court claimed that such gaming

activities could constitute an express waiver, we find this claim to be no more than

a misuse of the word "express."  See Black's Law Dictionary 580 (6th ed. 1990)

(defining express as "[m]anifested by direct and appropriate language, as

distinguished from that which is inferred from conduct.").  We hold, therefore, that

the Tribe did not expressly and unequivocally waive its immunity from this suit by

electing to engage in gaming under IGRA.

We are aware of the State's concern, echoed by the court in Maxam, 829 F.

Supp. at 281, that this holding will effectively nullify its rights under IGRA by

leaving it with no forum in which it can prevent the Tribe from violating IGRA

---

[8] See Santa Clara Pueblo, 436 U.S. at 58, 98 S. Ct. at 1677 (noting that waivers of sovereign immunity "cannot be implied but must be unequivocally expressed" (internal quotation marks omitted)); see also Oklahoma Tax Comm'n, 498 U.S. at 509-510, 111 S. Ct. at 909 (following United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 511-12, 60 S. Ct. 653, 655-56, 84 L. Ed. 894 (1940), in concluding that tribe did not waive sovereign immunity from counterclaim by filing action for injunctive relief); Puyallup Tribe, Inc. v. Department of Game, 433 U.S. 165, 173, 97 S. Ct. 2616, 2621, 53 L. Ed. 2d 667 (1977) (concluding that "the mere fact that the Tribe has appeared on behalf of [individual tribal members whom the State of Washington sued in its courts] does not effect a waiver of sovereign immunity for the Tribe itself"); Sac & Fox Nation v. Hanson, 47 F.3d 1061, 1063 (10th Cir. 1995) (finding that "a waiver of sovereign immunity cannot be inferred from the Nation's engagement in commercial activity"); American Indian Agric. Credit Consortium, Inc. v. Standing Rock Sioux Tribe, 780 F.2d 1374, 1378 (8th Cir. 1985) (rejecting conclusion that tribal sovereign immunity "need not be expressly waived, but can be waived by implication, in contract actions").

11

with impunity.  Even if we were to assume arguendo that the State is correct, it is far from clear that "tribal [sovereign] immunity [must give way to] federal jurisdiction when no other forum is available for the resolution of claims."[9]  Fluent v. Salamanca Indian Lease Auth., 928 F.2d 542, 547 (2d Cir. 1991) (rejecting this proposition); accord Ute Distrib. Corp. v. Ute Indian Tribe, 149 F.3d 1260, 1266 n.8 (10th Cir. 1998) ("The proposition that tribal immunity is waived if a party is otherwise left without a judicial remedy is inconsistent with the reasoning of Santa Clara Pueblo."); Makah Indian Tribe v. Verity, 910 F.2d 555, 560 (9th Cir. 1990) ("Sovereign immunity may leave a party with no forum for its claims."); cf. Florida Paraplegic Ass'n, 166 F.3d at 1134 (implying that lack of forum in which to pursue claim has no bearing on tribal sovereign immunity analysis).  We need not decide this question here, however, because it is clear that other fora do exist in which the State may press its claims.  For example, the State can request that the United States prosecute the Tribe or its members for violating applicable state or

---

[9] In part, the Maxam court seems to have based its conclusion that tribal immunity must give way in such circumstances on the Supreme Court's opinion in Oklahoma Tax Commission, which it cites for the proposition that "tribal sovereign immunity does not excuse tribes from all legal obligations."  Maxam, 829 F. Supp. at 281 (citing Oklahoma Tax Comm'n, 498 U.S. at 512-15, 111 S. Ct. at 911-12).  This reading of Oklahoma Tax Commission is overly broad.  In that case, the Supreme Court stated merely that the doctrine of tribal sovereign immunity "does not excuse a tribe from all obligations to assist in the collection of validly imposed state sales taxes."  498 U.S. at 512, 111 S. Ct. at 911.  "To say [– as the Court did in Oklahoma Tax Commission – that] substantive state laws apply to off-reservation conduct, however, is not to say that a tribe no longer enjoys immunity from suit."  Kiowa Tribe, 523 U.S. at —, 118 S. Ct. at 1703.

12

federal gambling laws.[10]  See supra part I (listing the various criminal laws

allegedly violated by the Tribe).  The State can also ask the National Indian

Gaming Commission ("NIGC") to fine the Tribe or to close its gaming facilities.

See 25 U.S.C. § 2713 (1994).


3.

Finally, the State seeks to avoid the bar of tribal sovereign immunity by

arguing that the Tribe's immunity does not necessarily extend to this action for

---

[10] We express no opinion regarding the merits of such a prosecution or any possible defenses thereto.  We note, however, that the United States has opted (at least initially) to forgo prosecution in favor of bringing a civil enforcement action to enjoin the Tribe's allegedly unauthorized gaming activities.  The Tribe moved to dismiss the Government's complaint for failure to state a claim, arguing that the Government had no authority to seek civil injunctive relief.  The district court held that the Government did have such authority under Florida law as applied to Indian country by 18 U.S.C. § 1166(a).  See United States v. Seminole Tribe, No. 97-1481-Civ-T-17A, — F. Supp. 2d — (M.D. Fla. March 4, 1999) (denying motion to dismiss); Fla. Stat. ch. 849.20-21 (1997); cf. infra note 13 (discussing whether section 1166(a) incorporates Florida law in this manner).  In so holding, the court seemed to be cognizant of the rule that equity will not enjoin the commission of a crime, which is a corollary of the more general principle that injunctive relief is unavailable when there is an adequate remedy at law.  See, e.g., Weaver v. Florida Power & Light Co., 172 F.3d 771, 773 (11th Cir. 1999) (stating general principle); United States v. Washington Post Co., 446 F.2d 1322, 1324 (D.C. Cir. 1971); United States v. Bay Mills Indian Community, 692 F. Supp. 777, 779-80 (W.D. Mich. 1988), vacated on other grounds, 727 F. Supp. 1110 (W.D. Mich. 1989); 11A Charles Alan Wright et al., Federal Practice & Procedure § 2942, at 70-71 (2d ed. 1995).  The court apparently concluded that this rule was inapplicable in light of its holding that an action for injunctive relief was specifically authorized by applicable Florida law.  See, e.g., United States v. Santee Sioux Tribe, 135 F.3d 558, 565 (8th Cir.), cert. denied, — U.S. —, 119 S. Ct. 48, 142 L. Ed. 2d 37 (1998) (recognizing exception to rule if statute expressly grants court power to enjoin crime); LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 434 (2d Cir. 1995); United States v. Buttorff, 761 F.2d 1056, 1063 (5th Cir. 1985); United States v. Jalas, 409 F.2d 358, 360 (7th Cir. 1969).  We express no opinion on the correctness of either this conclusion or the district court's holding.

prospective equitable relief. This argument is rooted in the following comment from Justice Stevens' concurring opinion in Oklahoma Tax Commission: "the Court today recognizes that a tribe's sovereign immunity from actions seeking money damages does not necessarily extend to actions seeking [prospective] equitable relief." 498 U.S. at 516, 111 S. Ct. at 913 (Stevens, J., concurring). Some of the above-mentioned courts have seized upon Justice Stevens' comment to support their conclusion that tribal sovereign immunity does not bar a suit to require tribal compliance with the statutory conditions precedent to gaming under IGRA. See Maxam, 829 F. Supp. at 281-82; Ross, 809 F. Supp. at 744-45.

We conclude that Justice Stevens' comment provides no solace to the State, however, because it is not the law. In Santa Clara Pueblo, 438 U.S. at 58-59, 98 S. Ct. at 1677, decided well before Oklahoma Tax Commission, the Court unequivocally upheld a tribe's immunity from a suit that sought only declaratory and prospective injunctive relief. In our view, this aspect of Santa Clara Pueblo remains the law today. Despite Justice Stevens' claim to the contrary (which was not joined by any other member of the Court), the Oklahoma Tax Commission majority announced that it was "not disposed to modify the long-established

14

principle of tribal sovereign immunity."[11]  498 U.S. at 510, 111 S. Ct. at 910.

Moreover, the Court has since reaffirmed the doctrine of tribal sovereign immunity

– over Justice Stevens' dissent – in the strongest of terms.  See Kiowa Tribe, 523

U.S. at —, 118 S. Ct. at 1702 ("As a matter of federal law, an Indian tribe is

subject to suit only where Congress has authorized the suit or the tribe has waived

its immunity." (emphasis added)).

We discern two very good reasons for the Court's reluctance to sanction

modifications of tribal sovereign immunity doctrine such as the one advocated by

Justice Stevens:  lack of precedent and deference to Congress.  As to the first

reason, we are aware of Justice Stevens' view that Edelman v. Jordan, 415 U.S.

651, 664-65, 94 S. Ct. 1347, 1356-57, 39 L. Ed. 2d 662 (1974), provides analogical

support for his conception of tribal sovereign immunity.  See Oklahoma Tax

Comm'n, 498 U.S. at 515, 111 S. Ct. at 912 (Stevens, J., concurring).  We

respectfully disagree.  Edelman merely discusses the type of relief that may be

obtained in a suit against an individual officer of a sovereign; it says nothing

whatsoever that could be construed to support the proposition that an otherwise-

---

[11] In addition, as the Tenth Circuit has noted, the majority opinion implicitly rejected Justice Stevens' position by suggesting certain alternative remedies – other than a suit against the Tribe – that Oklahoma could pursue in order to collect its sales tax.  See Oklahoma Tax Comm'n, 498 U.S. at 514, 111 S. Ct. at 912; Citizen Band Potawatomi Indian Tribe v. Oklahoma Tax Comm'n, 969 F.2d 943, 948 n.5 (10th Cir. 1992).

immune sovereign may <u>itself</u> be sued if only prospective equitable relief is sought. <u>Cf</u>. <u>Seminole Tribe</u>, 517 U.S. at 58, 116 S. Ct. at 1124 ("[W]e have often made it clear that the relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the [principle of sovereign immunity embodied in the] Eleventh Amendment."). Regarding the issue of deference, we note that Congress has been consistent in its approval of the Supreme Court's tribal sovereign immunity doctrine and has acted against the background of this doctrine in order to restrict tribal immunity in certain circumstances. <u>See</u> <u>Kiowa Tribe</u>, 523 U.S. at —, 118 S. Ct. at 1705; <u>Oklahoma Tax Comm'n</u>, 498 U.S. at 510, 111 S. Ct. at 910. In addition, the Court has stated that "Congress is in a position to weigh and accommodate the competing policy concerns and reliance interests" associated with any decision to alter the limits of tribal immunity. <u>Kiowa Tribe</u>, 523 U.S. at —, 118 S. Ct. at 1705. It is little wonder, therefore, that the Court has chosen to defer to Congress rather than to revisit its own tribal sovereign immunity jurisprudence. <u>See</u> <u>id</u>.

In light of these considerations, we decline to modify the doctrine of tribal sovereign immunity absent an express command to the contrary from either Congress or a majority of the Supreme Court. Accordingly, we reject the State's argument that the Tribe's immunity does not necessarily extend to this action for

16

prospective equitable relief. The district court's holding that sovereign immunity

bars the State's suit against the Tribe is affirmed.

## B.

We now turn to the district court's holding that the State failed to state a

claim against Chairman Billie[12] because there is no implied right of action[13] under

---

[12] The State has alleged that Chairman Billie "is responsible for the conduct of gambling activities by the Tribe pursuant to IGRA." Chairman Billie has not claimed that the Tribe's sovereign immunity shields him from this suit. Cf. Tamiami Partners, Ltd., — F.3d at — [slip op. at 2765] ("[T]ribal officers are protected by tribal sovereign immunity when they act in their official capacity and within the scope of their authority; however, they are subject to suit under the doctrine of Ex parte Young when they act beyond their authority.").

[13] It is unclear whether IGRA could properly be viewed as giving the State an express right to sue Chairman Billie for injunctive relief. Because there is no compact between the State and the Tribe, the cause of action expressly created by 25 U.S.C. § 2710(d)(7)(A)(ii) is plainly not available to the State. See supra part II.A.1. We note, however, that Florida law expressly provides that an action may be brought in state court to enjoin the continuation of a "common nuisance," which term is defined to include the "slot machines" allegedly operated by the Tribe. See Fla. Stat. ch. 849.20-21 (1997). In its amended complaint, the State contended that the district court could entertain an action for injunctive relief pursuant to this provision "as incorporated into federal law by 18 U.S.C. § 1166."

Section 1166, which was enacted as part of IGRA, provides in pertinent part that, "for purposes of Federal law, all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State." 18 U.S.C. § 1166(a) (emphasis added). An examination of cases that have addressed this provision engenders some doubt about whether it would permit a state to bring an action in federal court seeking state-law injunctive relief against a tribe for violating state gambling laws. Compare United States v. Santee Sioux Tribe, 135 F.3d 558, 563-65 (8th Cir.), cert. denied, — U.S. —, 119 S. Ct. 48, 142 L. Ed. 2d 37 (1998) (concluding that U.S. Attorney could obtain injunction pursuant to section 1166 to enforce order of National Indian Gaming Commission closing tribal casino where state law permitted action for injunctive relief against gambling operation that constituted public nuisance), and United States v. Seminole Tribe, No. 97-1481-Civ-T-17A, — F. Supp. 2d — (M.D. Fla. March 4, 1999) (see supra note 10), with United States v. Spokane Tribe of Indians, 139 F.3d 1297, 1298-1302 & n.7 (9th Cir. 1998) (vacating

IGRA for declaratory or injunctive relief against class III gaming that is being unlawfully conducted without a Tribal-State compact. In <u>Cort v. Ash</u>, 422 U.S. 66, 95 S. Ct. 2080, 45 L. Ed. 2d 26 (1975), the Supreme Court set forth four factors that are relevant in determining whether a private right of action is implicit in a statute:

> First, is the plaintiff "one of the class for whose <u>especial</u> benefit the statute was enacted," – that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

---

injunction against tribal gaming, which district court had entered pursuant to "IGRA and its incorporation of state law," on ground that portions of IGRA remaining after Supreme Court's <u>Seminole Tribe</u> decision could not support injunction in certain circumstances), <u>United States v. E.C. Invs., Inc.</u>, 77 F.3d 327, 330 (9th Cir. 1996) (narrowly interpreting phrase "for purposes of Federal law" in section 1166(a) as reference to other federal laws such as 18 U.S.C. § 1955), <u>United States v. Santa Ynez Band of Chumash Mission Indians</u>, 983 F. Supp. 1317, 1322-23, 1325 (C.D. Cal. 1997) (discussing structure of section 1166, suggesting (in light of legislative history) that section 1166(a) provides no basis for civil enforcement of state gambling laws by any entity, and reading Ninth Circuit precedent as foreclosing such enforcement by states), <u>and Sycuan Band of Mission Indians v. Roache</u>, 788 F. Supp. 1498, 1506-07 (S.D. Cal. 1992), <u>aff'd</u>, 54 F.3d 535 (9th Cir. 1994) (stating that Congress, in section 1166(a), federalized state gaming laws for purposes of regulating class III gaming but that states lack jurisdiction to enforce these laws in Indian country unless a Tribal-State compact provides otherwise).

As interesting as this question may be, its resolution will have to wait. Although the State referred to section 1166(a) in its complaint, the State has not subsequently argued – either in opposing the Tribe's motion to dismiss or on appeal – that section 1166(a) provides it with an express cause of action against Chairman Billie. We therefore decline to consider such an argument here. See <u>Montgomery v. Noga</u>, 168 F.3d 1282, 1297 n.24 (11th Cir. 1999); <u>Adler v. Duval Co. Sch. Bd.</u>, 112 F.3d 1475, 1480-81 (11th Cir. 1997).

Id. at 78, 95 S. Ct. at 2088 (citations omitted).  The central inquiry under this framework is whether Congress intended to create the asserted private right of action.  See Touche Ross & Co. v. Redington, 442 U.S. 560, 568, 99 S. Ct. 2479, 2485, 61 L. Ed. 2d 82 (1979); Florida Dep't of Bus. Regulation v. Zachy's Wine & Liquor, Inc., 125 F.3d 1399, 1403 (11th Cir. 1997).  Thus, when an examination of one or more of the Cort factors "unequivocally reveals congressional intent[,] there is no need for us to trudge through all four of the factors."  Liberty Nat'l Ins. Holding Co. v. Charter Co., 734 F.2d 545, 558 (11th Cir. 1984) (internal quotation marks omitted) (quoting Merrill Lynch, Pierce, Fenner & Smith v. Curran, 456 U.S. 353, 388, 102 S. Ct. 1825, 1844, 72 L. Ed. 2d 182 (1982)); see also Noe v. Metropolitan Atlanta Rapid Transit Auth., 644 F.2d 434, 436-37 (5th Cir. Unit B May 1981).[14]

The first Cort factor is a threshold question that must be "answered by looking to the language of the statute itself."  Cannon v. University of Chicago, 441 U.S. 667, 689, 99 S. Ct. 1946, 1953, 60 L. Ed. 2d 560 (1979); see also Noe, 644 F.2d at 437.  Most of the statutes that the Tribe has allegedly violated in this case are criminal in nature, see supra part I; the State does not contend that these

---

[14] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

19

statutes implicitly provide it with a right of action against the Tribe. Cf. Cannon, 441 U.S. at 690-93 & n.13, 99 S. Ct. at 1954-55 & n.13 (distinguishing criminal statutes and other statutes that impose duties for the benefit of the general public from statutes that explicitly confer rights directly on identified classes of persons, and noting the Supreme Court's reluctance to imply causes of action under the former type of statute); Taylor v. Citizens Fed. Sav. & Loan Ass'n, 846 F.2d 1320, 1322 (11th Cir. 1988) (same). The sole non-criminal statutory violation ascribed to the Tribe is a violation of IGRA's rule that "[c]lass III gaming activities shall be lawful on Indian lands only if such activities are . . . conducted in conformance with a Tribal-State compact . . . that is in effect." 25 U.S.C. § 2710(d)(1)(C). We acknowledge that the language of this rule, if considered in isolation, could be viewed as granting states a qualified[15] federal right to be free from class III tribal gaming activities within their borders in the absence of a compact regulating such activities. Cf. Seminole Tribe, 517 U.S. at 58, 116 S. Ct. at 1124 (noting that IGRA "grants the States a power that they would not otherwise have, viz., some measure of [civil/regulatory] authority over gaming on Indian lands"). Nevertheless, we conclude that the legislative history and statutory scheme of

---

[15] See 25 U.S.C. § 2710(d)(3)(A) (1994) ("Upon receiving [a tribal request to negotiate a compact governing the conduct of gaming activities], the State shall negotiate with the Indian tribe in good faith to enter into such a compact.").

IGRA – the second and third <u>Cort</u> factors – unequivocally demonstrate that Congress did not intend to vindicate any such right by creating a private right of action that would allow states to obtain injunctive relief against uncompacted class III tribal gaming. <u>See</u> <u>Noe</u>, 644 F.2d at 437-38 (stating that the first <u>Cort</u> factor is a necessary, but not a sufficient, basis for finding an implied right of action, and noting that a statement to the contrary in <u>Cannon</u> is no longer the law).

The legislative history of IGRA indicates that Congress, in developing a comprehensive approach to the controversial subject of regulating tribal gaming, struck a careful balance among federal, state, and tribal interests. <u>See</u> S. Rep. No. 100-446, at 5-6 (1988), <u>reprinted in</u> 1988 U.S.C.C.A.N. 3071, 3074-76. A central feature of this balance is IGRA's thoroughgoing limits on the application of state laws and the extension of state jurisdiction to tribal lands. <u>See</u> <u>id</u>. The legislative history reveals that Congress constructed limits on state power with particular care in the area of class III gaming. The Senate Report states that, in adopting the position that class III gaming may not be conducted on tribal lands without a Tribal-State compact, "the [Select Committee on Indian Affairs] has carefully considered the law enforcement concerns of tribal and State governments, as well as those of the Federal Government, and the need to fashion a means by which differing public policies of these respective governmental entities can be

21

accommodated and reconciled."  Id. at 6, 1988 U.S.C.C.A.N. at 3076; see also id.

at 13, 1988 U.S.C.C.A.N. at 3083 (listing objectives of state and tribal

governments regarding the conduct of class III gaming).  After balancing these

concerns, "[t]he Committee concluded that the compact process is a viable

mechanism for setting various matters between [states and tribes as] equal

sovereigns."  Id.  With regard to this process, the Committee recognized "the need

to provide some incentive for States to negotiate with tribes in good faith because

tribes will be unable to enter into such gaming unless a compact is in place."  Id.

Although it appreciated the difficulty of finding such an incentive, the Committee

unequivocally stated its "intent that the compact requirement for class III not be

used as a justification by a State for excluding Indian tribes from such gaming."

Id.  We would surely frustrate this intent – and upset the carefully-struck

congressional balance of federal, state, and tribal interests and objectives[16] – by

recognizing an implied right of action under IGRA in which a state, on its own

---

[16] See Santa Clara Pueblo, 436 U.S. at 64, 98 S. Ct. at 1680 ("Where Congress seeks to
promote [multiple] objectives in a single statute, courts must be more than usually hesitant to
infer from its silence a cause of action that, while serving one legislative purpose, will disserve
[another]."); S. Rep. No. 100-446, at 6, 1988 U.S.C.C.A.N. at 3076 ("[IGRA] is intended to
expressly preempt the field in the governance of gaming activities on Indian lands.
Consequently, Federal courts should not balance competing Federal, State, and tribal interests to
determine the extent to which various gaming activities are allowed.").

22

initiative, could sue to enjoin a tribe from conducting class III gaming without a compact. This we decline to do.

The statutory scheme of IGRA provides additional evidence of congressional intent that strongly supports our decision not to find an implied right of action. It is a well-established principle of statutory construction that "when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 63 F.3d 1030, 1049 (11th Cir. 1995) (quoting National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers, 414 U.S. 453, 458, 94 S. Ct. 690, 693, 38 L. Ed. 2d 646 (1974)). In IGRA, Congress provided a multitude of express remedies. See, e.g., 25 U.S.C. § 2710(d)(7)(A)(ii) (authorizing state or tribal suit to enjoin class III gaming conducted in violation of compact); 25 U.S.C. § 2710(d)(7)(A)(iii) (1994) (authorizing suit by Secretary of Interior to enforce procedures for conducting class III gaming); 25 U.S.C. § 2711(d) (1994) (authorizing tribal suit to compel Chairman of NIGC either to approve or to disapprove management contract); 25 U.S.C. § 2713(a)(2), (b)(2) (1994) (creating right to hearing before NIGC regarding fine imposed or temporary closure ordered by Chairman); 25 U.S.C. § 2713(c), 2714 (1994) (authorizing appeal to district court of NIGC fines, permanent closure orders, and certain other

23

decisions).  As discussed in part II.A.2., <u>supra</u>, two such remedies are particularly

relevant to the problem of uncompacted class III tribal gaming.  Under 25 U.S.C. §

2713, the NIGC can fine a tribe or close a tribal gaming facility if it finds that the

tribe is conducting class III gaming without a compact in violation of 25 U.S.C. §

2710(d)(1)(C).  In addition, under 25 U.S.C. § 2710(d)(6), Congress declined to

shield those who engage in class III tribal gaming without a compact from federal

criminal prosecution pursuant to statutes such as 15 U.S.C. § 1175(a).

The existence of these various express remedies is a clear signal that we

should not read into IGRA the implied right of action asserted by the State.  <u>See</u>

<u>Touche Ross & Co.</u>, 442 U.S. at 572, 99 S. Ct. at 2487 ("Obviously, then, when

Congress wished to provide a private . . . remedy, it knew how to do so and did so

expressly."); <u>Tamiami</u>, 63 F.3d at 1049.  Moreover, it is important to recognize that

such an implied right of action would wreak havoc upon the existing remedial

scheme of IGRA.  For example, as noted in part II.A.1. above, IGRA expressly

authorizes a state to sue a tribe in district court "to enjoin a class III gaming

activity [1] located on Indian lands and [2] conducted in violation of any Tribal-

State compact . . . that is in effect."  25 U.S.C. § 2510(d)(7)(A)(ii).  Giving a state

an implied right of action against class III tribal gaming conducted in the absence

of a compact would be tantamount to deleting the second requirement that must be

24

met in order for the state to pursue this express right of action.[17]  If Congress had wanted to delete this portion of the statute, it could easily have done so.  We will not usurp the legislative role by deleting it ourselves, particularly when doing so would undermine one of the few remaining incentives for a state to negotiate a compact with a tribe.[18]

Recognizing an implied right of action would also have a detrimental impact on the criminal remedial scheme which IGRA contemplates that the United States will use to combat illegal tribal gaming.  To illustrate this problem, assume that an official of a tribe that has no compact operates class III games that constitute "gambling devices" within the meaning of 15 U.S.C. § 1171(a).  This official could

---

[17] It could be argued, of course, that deleting the second requirement would do more than create the right of action sought by the State here.  Theoretically, such a deletion would also allow a state to sue for injunctive relief against class III tribal gaming conducted in conformity with a compact.  It seems quite unlikely, however, that any such suit would ever be brought:  not only would a state have little incentive to sue a tribe on this ground, but the tribe could presumably use the compact as a defense.

[18] In Seminole Tribe, 517 U.S. at 55-73, 116 S. Ct. at 1123-1132, the Supreme Court struck down a provision of IGRA that would have allowed a tribe to sue a state for failing to negotiate in good faith regarding the formation of a compact.  This tribal suit provision was IGRA's primary incentive for states to negotiate with tribes.  In this case, by effectuating Congress' intent to permit a state to sue a tribe for a class III gaming violation only where a compact is present, we preserve at least some incentive for states to enter into compact negotiations.  The tribes also have an incentive to participate in such negotiations because they face possible NIGC action or federal prosecution if they engage in uncompacted class III gaming.

be prosecuted by the United States for violating 15 U.S.C. § 1175.[19]  If the state in which the gaming occurred could beat the prosecutor to the punch by persuading a court to enter an injunction against any further operation of the games, two negative consequences would result.  First, the official would be deprived of his congressionally-recognized right to invoke the safeguards of criminal procedure when his gaming activities are challenged in court.  Second, the discretion of the United States not to prosecute the official would be severely restricted in light of the court's recognition that improper gaming had occurred.  It is consequences such as these that underpin the traditional rule that equity will not enjoin the commission of a crime.  See 11A Charles Alan Wright et al., Federal Practice & Procedure § 2942, at 70-71 (2d ed. 1995); supra note 10 (discussing this rule).  We will not depart from this rule by creating an implied right of action under which a state can attempt to force the hand of a federal prosecutor in this manner.

In light of our conclusion that the second and third Cort factors unequivocally counsel against implying the private right of action sought by the State, we do not consider the fourth factor here.  We hold, therefore, that the State has no implied right of action under IGRA for declaratory or injunctive relief

[19] If we alter the above illustration by assuming that the official could be prosecuted under either 18 U.S.C. § 1166(b) or 18 U.S.C. § 1955 for operating the uncompacted class III games, the result is equally troubling.  Cf. supra part I (discussing the various criminal statutes allegedly violated by the Tribe in this case).

26

against class III tribal gaming that is being unlawfully conducted without a Tribal-State compact.

## III.

For the foregoing reasons, the order of the district court granting the defendants' motion to dismiss is AFFIRMED.